Robert N. Peterson and Martha T. Peterson v. Commissioner.
Peterson v. Commissioner
Docket No. 95108.
United States Tax Court
T.C. Memo 1964-15; 1964 Tax Ct. Memo LEXIS 322; 23 T.C.M. (CCH) 63; T.C.M. (RIA) 64015; January 28, 1964
*322 The stock of X corporation was held 37 1/2 percent by a trust, 37 1/2 percent by M, the vice-president and manager, and 25 percent by R, the president. Under unusual circumstances, M offered in 1958 to sell all of his shares, under an option agreement which he prepared, to R. Upon the whole record it is held: That R acted for a syndicate consisting of the trust, individuals, himself, and the corporation who were the actual purchasers of the 375 shares of M; that the corporation acquired it from M, not R (the petitioner), and redeemed 128 shares, under section 317(b), 1954 Code, for $192,000; that the corporation did not pay a "pre-existing debt" of R in the sum of $192,000; that section 302(b)(1) applies to the redemption of 128 shares, and the payment of $192,000 for the redemption of the shares was not equivalent to a taxable dividend to R of $192,000, constructive or otherwise. Stafford R. Grady, for the petitioners. Marion Malone, for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The respondent determined a deficiency in income tax for the year 1958 in the amount of $142,044.57. In 1958, Peterson Manufacturing Company acquired 128 shares of its common stock for $192,000, *324 which have been held since then as treasury shares. The issue presents the questions whether Robert M. Peterson, a stockholder, is chargeable with a constructive distribution by the corporation to him of a "dividend" in the amount of $192,000, under the provisions of section 316, and whether the transaction involved does not come within section 302(b)(1), 1954 Code. Findings of Fact The stipulated facts are so found and are incorporated herein by this reference. Petitioners filed a joint return for the calendar year 1958, on a cash basis, with the district director of internal revenue in Los Angeles, California. Since the issue relates to Robert N. Peterson, he is referred to hereinafter as the petitioner. Summary: The issue involves Peterson Manufacturing Company, Inc., doing business in Los Angeles, California, a California corporation incorporated in December 1947 to continue and conduct a business operated in Los Angeles as a co-partnership from 1914 until the date of incorporation in 1947. Petitioner is and since March 21, 1952, has been the president of Peterson Manufacturing Company (frequently referred to hereinafter as the Los Angeles company or the corporation). The *325 business of the corporation is the manufacture and sale of tallow, grease, bone meal, meat scraps, hides, and similar items which are processed and manufactured from suet, fat, bones, blood, and trimmings, which materials are purchased from butcher shops, chain stores, supermarkets, meat jobbers, butcher shops, and restaurants. The sales of tallow are made to soap manufacturers, in local areas and abroad, and meat and bone meal are sold to producers of poultry feed. The business of this corporation was organized in 1914 as a partnership by petitioner's father and two uncles. In 1942, Richard B. Mortimer was employed as the general manager. Prior to 1952 petitioner's uncles died; in 1952 his father died. Petitioner was and is, also, the president of Peterson Tallow Company, Inc., which carries on the same kind of business in Emeryville, California, near Oakland. He managed that business and was obliged to spend all of his time there. After the death of petitioner's father in 1952, Mortimer had full managerial control of the business of the Los Angeles company; practically unlimited managerial control. Early in 1957, two scandals involving thefts and swindles were discovered in the *326 operations of the Los Angeles company. One involved embezzlements and thefts of its funds by three employees, the chief bookkeeper, the assistant general manager, and the paymaster and traffic manager; all were indicted, convicted, and sentenced to serve terms in jail. The second involved a fraudulent conspiracy and swindle carried on by about one-half of the truck drivers of Peterson Manufacturing Company and about 53 owners or managers of small meat markets. Discovery of this conspiracy followed the discovery of the embezzlements by the three employees. The truck drivers' conspiracy was operated in the following way: The drivers collected and bought for the company waste suet and bones from both the large chain stores and smaller meat markets. The drivers would give the chain stores a short weight and pay them less than they were entitled to receive for the actual weight of materials collected; they would overcredit the smaller independent meat markets involved for more than the weight of materials collected from them, in the amount of the difference between the short weight credited to and the actual weight collected from the chain stores. Peterson corporation unknowingly underpaid *327 the chain stores and overpaid the smaller markets on the basis of its truck drivers' tickets. The owners or managers of the smaller markets then split the overpayments, giving about two-thirds to the truck drivers of Peterson Company who personally kept the sums fraudulently collected. The conspiracy had the effect of swindling the chain store markets. The Los Angeles County District Attorney's Office investigated the scheme and the Grand Jury indicted those involved, who were convicted, all of which was reported in the Los Angeles press, which was harmful to the Peterson corporation. In addition, in the spring of 1958 petitioner received numerous complaints from various sources to the effect that Mortimer's management was harmful to the Los Angeles business. It was reported, among other things, that Mortimer's conduct of the business involved unnecessary and large expenditures and that the earnings and profits were considerably lower than the potential of the business. Petitioner, meanwhile, had been making comparative analyses of the costs and earnings of the Los Angeles and Emeryville corporations. It was unfavorable to the Los Angeles company. He also engaged in July 1958 the *328 services of an independent firm of management consultants in San Francisco, William B. Logan & Associates, to make a survey of the operations and management of Peterson Manufacturing Company, which was completed under a lengthy written report dated September 5, 1958, and was severely critical of Mortimer's management. Petitioner concluded that there had been gross mismanagement of the Los Angeles business. Mortimer was confronted with the findings at a meeting with representatives of the Logan firm on September 24, 1958. Immediately thereafter, on the same day, Mortimer advised Stanley C. Smith, a director of the corporation and his father, Stanley J. Smith, both lawyers for the Peterson family, that he would be willing to sell his stock in the corporation, 375 shares (37 1/2 percent), or purchase all of Robert Peterson's stock, 250 shares, and the stock owned by the Nels Peterson Trust, 375 shares, because the corporation was not big enough to contain both himself and petitioner, who owned 250 shares (25 percent). On October 1, 1958, Mortimer presented separate written agreements covering his alternative proposals at a meeting with the Smiths and petitioner, and he told petitioner *329 that he would be willing to sell his stock or purchase stock at $1,500 a share. At this price, all of Mortimer's stock was offered for $562,500. Petitioner elected to execute immediately on October 1, 1958, the agreement wherein Mortimer agreed to sell his 375 shares. On October 2, 1958, petitioner met with Kendric B. Morrish, critical of Mortimer's management. Petitioner concluded that there had been gross mismanagement of the Los Angeles business. Mortimer was confronted with the findings at a meeting with representatives of the Logan firm on September 24, 1958. Immediately thereafter, on the same day, Mortimer advised Stanley C. Smith, a director of the corporation and his father, Stanley J. Smith, both lawyers for the Peterson family, that he would be willing to sell his stock in the corporation, 375 shares (37 1/2 percent), or purchase all of Robert Peterson's stock, 250 shares, and the stock owned by the Nels Peterson Trust, 375 shares, because the corporation was not big enough to contain both himself and petitioner, who owned 250 shares (25 percent). On October 1, 1958, Mortimer presented separate written agreements covering his alternative proposals at a meeting with the *330 Smiths and petitioner, and he told petitioner that he would be willing to sell his stock or purchase stock at $1,500 a share. At this price, all of Mortimer's stock was offered for $562,500. Petitioner elected to execute immediately on October 1, 1958, the agreement wherein Mortimer agreed to sell his 375 shares. On October 2, 1958, petitioner met with Kendric B. Morrish, a vice-president of the Oakland office of the then American Trust Company (which later merged with the Wells Fargo Bank of California) to arrange financing for the purchase of Mortimer's stock. Petitioner believed it was necessary to quickly relieve the Los Angeles corporation of Mortimer's services as general manager and director and that time was of the essence in order to commit Mortimer to his offer. Petitioner presented the bank with a plan. The bank considered it a reasonable one, accepted the proposals, and the substance of petitioner's original proposals were carried out. The plan, having several steps, included petitioner's agreement to move to Los Angeles and devote all of his time to the management of the Los Angeles Company, and to have Nels Hamberg manage the Emeryville business. The plan involved purchase *331 of portions of the Mortimer block of stock by members of the Peterson family and trust, including petitioner, and by Peterson Manufacturing Company to be held as treasury stock. Petitioner had no intention when he executed the agreement of October 1, 1958, to purchase the entire 375 shares held by Mortimer; he did not have the means to do so. It was his intention to purchase about one-third, the remaining two-thirds to be purchased by other members of the Peterson family and trust and the corporation, one-third by each. The plan required the services of American Trust Company in making a temporary and immediate loan of $562,500 to be paid to Bank of America to close an escrow in exchange for the Mortimer certificate endorsed in blank which was to be held by American Trust pending the receipt in about 30 days of all of the cash payments by the several purchasers of their respective portions. American Trust was then to make a long-term loan of $200,000 to the corporation to enable it to purchase about one-third of the 375 shares; and a long-term loan to Robert Peterson of about $100,000 to enable him to pay the balance on his purchase of about one-third after making a payment of $50,000 *332 in cash. This plan was followed. Long-term loans were made of $200,000 to the corporation and $125,000 to Robert. The following schedule shows the purchasers of the Mortimer stock, the number of shares purchased by each, and the purchase price: Certif. No. and Date
No. of
Shares
Purchaser
Price
No. 6
12/ 8/58
15
Myrtle Peterson (Mother)
$ 22,500
No. 7
12/ 8/58
10
Anna Hamberg (Aunt)
15,000
No. 8
12/20/58
10
Patricia Janney (Sister)
15,000
No. 5
12/8 /58
51
Nels Hamberg (Cousin)
76,500
No. 9
12/31/58
121
Robert Peterson
181,500
No. 10
12/31/58
40
Estate, Nels Peterson
60,000
No. 11
12/31/58
128
Peterson Mfg. Co.
192,500
375
$562,500
Peterson Manufacturing Company has held the 128 shares as treasury shares since December 31, 1958. The dispute here relates to the transaction involving Mortimer's 375 shares. The contested deficiency in petitioner's income tax liability for 1958 results from the following determination of the respondent: * * * It is determined that the acquisition by Peterson Manufacturing Company, Inc. of the 128 shares was made in such manner as to be equivalent to *333 a dividend and taxable to you under the provisions of section 316 of the [1954] Internal Revenue Code. Further, it is determined that the transaction does not fall within the purview of section 302(b)(1) of the Internal Revenue Code. The detailed facts which are material and necessary in order to understand the issue are as follows: The Peterson Business and Family: Petitioner's grandfather and grandmother migrated from Sweden and in the 1890's they bought a hog ranch in Berkeley, California. They purchased scraps of fat, meat, and bones which were cooked and used in fattening the hogs. Fat and tallow were skimmed off the cooked materials, put in drums, and sold. This was the beginning of the business which later was carried on under the name of Peterson Tallow Company in Emeryville. The Petersons had three sons, Adolph, Otto, and Nels, petitioner's father. Petitioner's mother is Myrtle Peterson; his aunt is Anna Hamberg, a sister of Nels; his cousin is Nels Hamberg; and his sister is Patricia Janney. Nels, Adolf, and Otto, under a partnership, organized Peterson Tallow Company in about 1908. It was incorporated under California law on May 7, 1951. Nels *334 lived with his family in the area of Oakland, California, near Emeryville, and, with Adolf, managed the Tallow Company. Petitioner grew up, married, and lived in the Oakland area until the latter part of 1958 when he moved to the Los Angeles area, where he still lives; his residence is in Pasadena. He attended Stanford University in Palo Alto, California, where he majored in general business administration and was graduated in 1948. He was in the military service from 1943 to 1946. Petitioner was born in 1924, and in 1958 he was 34 years old. He was married in 1950 to Martha. In 1914, Adolf, Otto, and Nels Peterson commenced in Los Angeles the same kind of tallow rendering business as was carried on in Emeryville by the Peterson Tallow Company. They carried on such business in partnership under the name of Peterson Manufacturing Company. Otto resided in Los Angeles and managed the business there. Adolf and Nels resided in the area of Oakland. Otto died in 1941 and his son managed the business in Los Angeles for a short time. In 1942, Adolf and Nels employed Richard B. Mortimer as the general manager of the Los Angeles business. In 1950, Mortimer's age was in the 50's Mortimer previously *335 was a securities salesman employed by Schwabacher and Company in Oakland. Mortimer purchased a 25 percent interest in the Los Angeles business in 1945. Adolf died in 1946, and thereafter Mortimer purchased from Adolf's estate an additional 12 1/2 percent interest. At the same time in 1946, Robert N. Peterson (petitioner) acquired a 25 percent interest in the business from Adolf's estate. After Adolf's death, the ownership of the Los Angeles business was: Nels Peterson, 37 1/2 percent; Richard B. Mortimer, 37 1/2 percent, Robert N. Peterson, 25 percent. Peterson Manufacturing Co., Inc. was incorporated in California in December 1947; it purchased all of the assets of the partnership, and continued the conduct of that business. The authorized capital stock is 30,000 shares, $10 per share par value. There were originally issued 1,000 shares, $10,000, which were issued on January 29, 1948, as follows: Certificate No. 1, Nels Peterson
375 shares
37 1/2 percent
Certificate No. 2, Richard B. Mortimer
375 shares
37 1/2 percent
Certificate No. 3, Robert N. Peterson
250 shares
25 percent
1,000 shares
100 percent The partners transferred their partnership *336 interests and all of the assets to the corporation, which had a value of $190,329.62. On its books the original capitalization of the Los Angeles corporation was shown as $10,000 capital stock, and $180,329.62 paid-in estate an additional 12 1/2 percent interest. At the same time in 1946, Robert N. Peterson (petitioner) acquired a 25 percent interest in the business from Adolf's estate. After Adolf's death, the ownership of the Los Angeles business was: Nels Peterson, 37 1/2 percent; Richard B. Mortimer, 37 1/2 percent, Robert N. Peterson, 25 percent. Peterson Manufacturing Co., Inc. was incorporated in California in December 1947; it purchased all of the assets of the partnership, and continued the conduct of that business. The authorized capital stock is 30,000 shares, $10 per share par value. There were originally issued 1,000 shares, $10,000, which were issued on January 29, 1948, as follows: Certificate No. 1, Nels Peterson
375 shares
37 1/2 percent
Certificate No. 2, Richard B. Mortimer
375 shares
37 1/2 percent
Certificate No. 3, Robert N. Peterson
250 shares
25 percent
1,000 shares
100 percent The partners transferred their partnership *337 interests and all of the assets to the corporation, which had a value of $190,329.62. On its books the original capitalization of the Los Angeles corporation was shown as $10,000 capital stock, and $180,329.62 paid-in capital. The corporation keeps its books and files its returns on a calendar year and an accrual basis. The original officers and directors were: Nels Peterson, president and director; Robert N. Peterson, vice-president and director; Richard B. Mortimer, secretary-treasurer and director; John L. Bisher, Jr., and Charles B. Lafferty, directors. Mortimer was the general manager of the incorporated business, as he had been of the partnership beginning in 1942, until his resignation on October 21, 1958, which occurred under circumstances set forth hereinafter. Nels Peterson died in 1952. His will provided that his 375 shares of stock in Peterson Manufacturing Co., Inc. would be placed in trust for the benefit of his surviving spouse for life, and that upon her death the trust estate is to be distributed in equal shares to Robert N. Peterson and his sister, Patricia Peterson Janney. The trust is still in existence. The original trustees were Richard B. Mortimer, Robert N. *338 Peterson, and Stanley C. Smith. Under California law, the trust indenture being silent on the subject, the trustees are required to act unanimously in order to bind the trust. Stanley J. Smith was and is the attorney capital. The corporation keeps its books and files its returns on a calendar year and an accrual basis. The original officers and directors were: Nels Peterson, president and director; Robert N. Peterson, vice-president and director; Richard B. Mortimer, secretary-treasurer and director; John L. Bisher, Jr., and Charles B. Lafferty, directors. Mortimer was the general manager of the incorporated business, as he had been of the partnership beginning in 1942, until his resignation on October 21, 1958, which occurred under circumstances set forth hereinafter. Nels Peterson died in 1952. His will provided that his 375 shares of stock in Peterson Manufacturing Co., Inc. would be placed in trust for the benefit of his surviving spouse for life, and that upon her death the trust estate is to be distributed in equal shares to Robert N. Peterson and his sister, Patricia Peterson Janney. The trust is still in existence. The original trustees were Richard B. Mortimer, Robert *339 N. Peterson, and Stanley C. Smith. Under California law, the trust indenture being silent on the subject, the trustees are required to act unanimously in order to bind the trust. Stanley J. Smith was and is the attorney for the Nels Peterson family and maintains his offices in Oakland. His son, Stanley C. Smith, also is an attorney for the Peterson family and the Peterson Tallow Company, and he practices law with his father in Oakland. Robert N. Peterson (petitioner) has devoted all of his adult life to the Tallow rendering business; at first, the Peterson Tallow Company in Emeryville. While he was in high school, he worked for Peterson Tallow Company during weekends, holidays, and vacations. Following graduation from Stanford, he became associated with his father in the management of that company. Robert was elected president about 9 months before the death of his father in the early part of 1952, and became the general manager of Peterson Tallow Company. He is still the president of Tallow Company. Following the death of his father, Robert, on March 21, 1952, was elected president of Peterson Manufacturing Company and has held that office continuously up to the present. At *340 that time and thereafter until Robert moved to Los Angeles in the latter part of 1958, his duties as president and general manager of Peterson Tallow Company required that he continue to devote all of his time to the business of the Tallow Company. Accordingly, Mortimer continued to be the general manager of Peterson Manufacturing Company. However, Robert (as his father had done) visited the Peterson Manufacturing Company two or three times a year to look over the operations of the Los Angeles business. Over the years, following the death of Nels Peterson in 1952 and up to and including the transaction involved in this case, there were resentments, dissension, and conflicts between Mortimer and Robert Peterson. There appeared to be resentment on the part of Mortimer toward Robert, and Mortimer tried to curry the favor of a new director, Stanley C. Smith, in order to get Smith to agree with Mortimer's policies and operations of the Los Angeles corporation. Smith, however, chose to follow his own convictions and views. In March 1952, after the death of petitioner's father, the following were elected directors of Peterson Manufacturing Company: Robert Peterson, Richard B. Mortimer, *341 Stanley C. Smith, Charles B. Lafferty, and John L. Bisher, Jr. All of the above directors except Lafferty were the directors in October 1958. Leslie G. Turner in 1957 succeeded Lafferty on the board of directors. The firm of Gibson, Dunn & Crutcher in Los Angeles were the attorneys for the corporation, and Turner was associated with that firm. In 1956, the officers of the Los Angeles corporation were: Robert N. Peterson, president; Richard B. Mortimer, executive vice-president and treasurer; Stanley C. Smith, vice-president; and Willard H. Day, secretary. All were reelected in 1957. Day was succeeded as secretary by Dale Rycraft, Jr., at a special meeting of the directors on August 14, 1957; and at the same meeting Mrs. Sadie Solliday was elected assistant secretary. All of the above officers were reelected at the annual meeting of the directors on March 19, 1958. Embezzlements from the Los Angeles Corporation: Frederick F. Robertson was the chief bookkeeper of Peterson Manufacturing Company from the time he was employed in 1943 until he retired in March or early April 1957, and was in charge of the corporation's books. A new chief bookkeeper was hired. The new employee advised *342 Mortimer that an audit of the books should be made in order to protect himself and the corporation. Mortimer considered the advice good and engaged a firm of certified public accountants to make an audit. The audit disclosed irregularities in the handling and recording of cash and in the use of the butcher account as sources of funds for certain employees for their own uses and for other purposes than the purchase of materials; and that pertinent records of the corporation up until a few months before Robertson's retirement had been destroyed. Mortimer turned over information disclosed at the beginning of the audit to the Los Angeles County District Attorney's Office and its Investigative Bureau started an investigation on about April 25, 1957, which disclosed that Robertson was the originator of a scheme involving himself and two other employees, Willard H. Day, the assistant general manager (employed by the corporation in 1940) and chief assistant to Mortimer, and also the secretary of the corporation, and Melvin R. Maxey (employed in 1944) who became the paymaster and traffic manager in 1954 and held that job in 1957. It was discovered that the petty cash and butcher accounts had *343 been used and manipulated so as to enable those involved to take cash for their personal uses. There was a grand jury investigation. The three employees were indicted on July 10, 1957, and charged with criminal conspiracy, grand theft, embezzlement, and forgery; Robertson on 21 counts; Day and Maxey on 8 counts, each. All three were convicted after trial and sentenced on December 19, 1957, to serve jail terms; - Robertson and Day, one year; Maxey, 6 months; and all were placed on probation for 5 years. It was brought out during the investigation that Robertson had been convicted of embezzlement in 1928 on a charge of using his employer's funds to protect his stock market investments, which apparently was not ascertained by the Petersons when he was employed in 1943 and presented good recommendations. The exact amounts of the thefts and embezzlements could not be definitely ascertained because the employees involved had destroyed records, but it was ascertained that the conspiracy and acts had been carried on for several years. In the Probation Officer's report dated December 13, 1957, to the Superior Court, Judge Fildew, it was estimated that the employees' operations over several *344 years resulted in shortages (losses) in the corporation's books of approximately $699,000. After the conviction of Robertson, the corporation's attorneys in some manner learned that Robertson had cash and assets in Nevada in the estimated amount of about $100,000, or more, and the corporation sued Robertson in Nevada for recovery of $200,000 and for punitive damages. On May 1, 1958, the District Court for Clark County, Nevada, found that the evidence one year; Maxey, 6 months; and all were placed on probation for 5 years. It was brought out during the investigation that Robertson had been convicted of embezzlement in 1928 on a charge of using his employer's funds to protect his stock market investments, which apparently was not ascertained by the Petersons when he was employed in 1943 and presented good recommendations. The exact amounts of the thefts and embezzlements could not be definitely ascertained because the employees involved had destroyed records, but it was ascertained that the conspiracy and acts had been carried on for several years. In the Probation Officer's report dated December 13, 1957, to the Superior Court, Judge Fildew, it was estimated that the employees' *345 operations over several years resulted in shortages (losses) in the corporation's books of approximately $699,000. After the conviction of Robertson, the corporation's attorneys in some manner learned that Robertson had cash and assets in Nevada in the estimated amount of about $100,000, or more, and the corporation sued Robertson in Nevada for recovery of $200,000 and for punitive damages. On May 1, 1958, the District Court for Clark County, Nevada, found that the evidence established certain conversions of the corporation's funds, and the Court awarded the corporation a judgment of $172,799, compensatory damages, and $75,000 punitive damages; total $247,799. However, the gross recovery by the corporation, in 1958, was $96,120; the costs were $33,059; and the net recovery was $63,025. When the thefts by Willard H. Day were discovered, he was replaced as the assistant general manager and secretary of the corporation by Dale Rycraft, Jr. Soon after the Robertson conspiracy was discovered in April 1957, a second conspiracy involving many of the corporation's truck drivers was brought to Mortimer's attention. Mortimer and others observed that many of the truck drivers were spending *346 money, such as for new cars, apparently beyond their means. One of the heads of the meat department of one of the large stores proved to Mortimer what was going on. Mortimer reported this problem to the Los Angeles County District Attorney's Office. The District Attorney, in about April 1957, started to investigate this matter. The corporation hired investigators who reported to the District Attorney. The investigation was continued during the summer. Early in September 1957, the District Attorney presented evidence to the grand jury and arrests of truck drivers and market owners were made. In September or October 1957, 76 persons were indicted for conspiracy and theft; they were 19 truck drivers employed by Peterson Manufacturing Company, and 57 owners or managers of markets in metropolitan Los Angeles. The corporation paid the costs of the investigation of the truck drivers. The District Attorney's office could not assign enough men to handle that additional investigation. Various Los Angeles newspapers published news articles about the arrests, indictments, and convictions of Robertson, Day, and Maxey, and about the investigation and arrests of the truck drivers and store operators; *347 and reports were made over television. Robert Peterson, as president of the Los Angeles corporation, regarded the press and television reports about the two conspiracies as injurious to the reputation of the corporation. Robert Peterson's Inquiries: Mortimer briefly indicated to Robert Peterson, first on March 20, 1957, after the stockholders' and directors' meetings in Los Angeles, and later after a meeting in Emeryville in April 1957 of the stockholders of Peterson Tallow Corporation (attended by Mortimer as a trustee of the estate of Nels Peterson) that irregularities of Robertson and other irregularities had been discovered in the Los Angeles business but he said that he could not then report anything in detail. On June 20, 1957, Mortimer telephoned Robert and told him of the arrest for grand theft of the three employees and that they all had embezzled a substantial sum of money, but he said that he could not provide any more information at the time. Subsequently, in telephone conversations with Mortimer, Robert could not get more information. Mortimer declined to provide information; his reason was that his attorneys and the office of the District Attorney had advised him not *348 to discuss the matters. In July, Robert consulted his attorneys, Stanley J. and Stanley C. Smith in Oakland (who were not the attorneys for the Los Angeles corporation) about the advisability of sending a letter to Mortimer demanding more information. Mortimer had asked Robert not to go to Los Angeles to inquire and Robert therefore had not gone to Los Angeles, but he believed that as president he was entitled to know about the problems of the Los Angeles corporation. Stanley C. Smith approved of Robert's sending a letter to Mortimer because Robert had not been receiving information; Smith read and approved the letter. Robert sent a letter dated July 25, 1957, to Mortimer commenting on "the veil of secrecy" which had descended over the operations of the Los Angeles business, advising Mortimer that he could "no longer be kept in ignorance about the situation" which had developed and that it was his (Robert's) right to know "the true and complete story." This letter is incorporated herein by this reference. Robert requested that Mortimer send him the profit and loss statements and balance sheets of the Los Angeles corporation for March, April, May, June, and July 1957, and the subsequent *349 monthly statements and balance sheets. In this letter, Robert wrote, in part, as follows: No one feels his responsibility more than I. No one would feel worse than I if, in revealing the facts to me, any phase of the investigation would be impeded. I am prepared to take full personal responsibility if such were to happen. However, since the family and myself do represent a majority interest in the company, and, since I am an officer and director of the company, I feel it is imperative that this demand be made at this time. Therefore, I must ask that a complete written report be put in my hands at the earliest possible moment regarding the situation which has most regrettably occurred down there. This report must contain the following: a background of the thefts, the length of time over which the losses were incurred, how your suspicions were originally aroused, and the exact method or methods by which the money was taken; a resume of the investigation, who conducted the investigation, and the direction any current investigation is taking; an exact accounting of the losses discovered to date plus a realistic estimate of the total amount of the ultimate loss; and any and all other *350 information which may be pertinent to the case. I want this report to be kept as current as possible with supplements sent to me at close and regular intervals so that I am fully aware at all times exactly what is going on. * * * Upon receiving this letter, Mortimer expressed indignation to both Smith and Robert and demanded an apology; and Robert expressed to Mortimer his conviction that as president he had a duty and right to learn all the facts about the irregularities and that he would see to it that the Los Angeles business in the future was run on a better basis. The Truck Drivers' Conspiracy: The essential facts have been stated hereinbefore. The scheme represented thefts of money from the large chain store markets shared by the drivers and smaller store owners of managers. Convicted of petty thefts, fined, and put on one year's probation were 18 truck drivers of the corporation and about 51 co-conspirators, owners or managers of small meat markets. Investigation of Peterson Manufacturing Co.: Mortimer's management policies emphasized a program of modernizing the plant and equipment of the Los Angeles corporation, all of which involved capital expenditures of substantial *351 amounts. In 1956, $350,000 was borrowed at 5 percent interest from the Bank of America. Robert made continuing analyses for several years prior to 1958 comparing the costs of operations and the earnings of the Los Angeles corporation with the same factors in the Emeryville corporation. At a directors' meeting on March 19, 1958, it was noted that the Los Angeles corporation was paying $100,000 a year on the above debt. Mortimer requested approval of the construction of a new addition to the plant to accommodate new Remington Rand electronic office equipment, which was given. However, Robert inquired about labor and overhead costs and stated that efforts should be made to ascertain methods to reduce operating costs as much as possible. Robert's analyses had shown that Peterson Tallow Company was operating with much lower costs and its percent ratio of profits to sales was about twice as much as that of the Los Angeles corporation. The analyses were made in 1957 and early in 1958 and were reduced to writing and tabulation. Robert had become concerned about the increasing costs of operation of the Los Angeles business and the apparent failure to realize the proportionate increase in *352 earnings to be expected from the plant modernization and expansion program of Mortimer which had cost substantially in excess of $1,000,000, compared with expenditures of a similar type at the Tallow corporation's plant costing only $333,350 during the 5-year period 1953 through 1957. During this 5-year period costs at the Los Angeles plant, under Mortimer's management, rose substantially more than similar costs at the Emeryville plant, under Robert's management. The comparisons and magnitude of the increased costs in Los Angeles are shown by the following table prepared by Robert: Increased Cost and Volume Comparison
1953-1957
Peterson
Peterson
Manufac-
Tallow
turing,
(Percent-
L.A. (Per-
ages)
centages)
Truck labor
10.26
55.22
Factory labor
12.37
65.92
Office labor
35.75
65.89
Over-all labor
12.43
61.11
Raw material volume
7.23
30.60
Labor costs per ton of
raw material
0.02
25.1
Expenses (other than la-
bor) per ton of raw ma-
terial
18.00
61.20
Petitioner's comparison of the results of the operations of the two companies also showed the following: For the years 1953 through 1957, Peterson Tallow *353 Company had net sales of $7,454,812, and profits before Federal taxes of $959,323, or an average profit of 12.8 percent of sales. After taxes, the profit was $486,400, or an average profit of 6.53 percent of sales. For the same period, Peterson Manufacturing Company had net sales of $21,657,419, or an average of 4.7 percent of sales. After taxes, the net profit was $525,121, or an average profit of 2.42 percent of sales. Petitioner concluded that Mortimer's management of the Los Angeles corporation had resulted in a loss of after-tax profits of approximately $575,000 over the 5-year period ending on December 31, 1957, or an average loss of profits after taxes of $115,000 per year. Although the Peterson Manufacturing Company business had been sufficiently profitable to pay dividends of $48 per share in the years 1950 through 1954, dividends had to be reduced to $20 a share in 1955 and 1956, and were eliminated completely in 1957 and 1958. Petitioner concluded, further, that much of the substantial difference
terial 18.00 61.20 Petitioner's comparison of the results of the operations of the two companies also showed the following: For the years 1953 through 1957, Peterson Tallow *354 Company had net sales of $7,454,812, and profits before Federal taxes of $959,323, or an average profit of 12.8 percent of sales. After taxes, the profit was $486,400, or an average profit of 6.53 percent of sales. For the same period, Peterson Manufacturing Company had net sales of $21,657,419, or an average of 4.7 percent of sales. After taxes, the net profit was $525,121, or an average profit of 2.42 percent of sales. Petitioner concluded that Mortimer's management of the Los Angeles corporation had resulted in a loss of after-tax profits of approximately $575,000 over the 5-year period ending on December 31, 1957, or an average loss of profits after taxes of $115,000 per year. Although the Peterson Manufacturing Company business had been sufficiently profitable to pay dividends of $48 per share in the years 1950 through 1954, dividends had to be reduced to $20 a share in 1955 and 1956, and were eliminated completely in 1957 and 1958. Petitioner concluded, further, that much of the substantial difference in earnings was due to expensive and unnecessary things Mortimer was doing in Los Angeles and a lack of cost accounting controls. Petitioner suggested at the March 1958 meeting *355 of the board of directors of the Los Angeles corporation that a comprehensive cost study and analysis should be made, and that cost accounting controls should be instituted. Petitioner received numerous complaints from employees and former employees of the Los Angeles company in the spring and early summer of 1958 which were severely critical of Mortimer and his management policies, about which he consulted Stanley C. Smith, a director, who advised him to communicate with those individuals for the purpose of learning what they wanted to report and to make written memoranda of their reports and obtain written statements from them, all of which petitioner did. Smith had received complaints about Mortimer, also. Among those interviewed by petitioner were former and present employees, Mortimer's former secretary, and brokers who handled sales of the products of the Los Angeles Company in the domestic markets and in Japan. The information petitioner obtained was to the following effect: Brokers stated that the quality in earnings was due to expensive and unnecessary things Mortimer was doing in Los Angeles and a lack of cost accounting controls. Petitioner suggested at the March 1958 *356 meeting of the board of directors of the Los Angeles corporation that a comprehensive cost study and analysis should be made, and that cost accounting controls should be instituted. Petitioner received numerous complaints from employees and former employees of the Los Angeles company in the spring and early summer of 1958 which were severely critical of Mortimer and his management policies, about which he consulted Stanley C. Smith, a director, who advised him to communicate with those individuals for the purpose of learning what they wanted to report and to make written memoranda of their reports and obtain written statements from them, all of which petitioner did. Smith had received complaints about Mortimer, also. Among those interviewed by petitioner were former and present employees, Mortimer's former secretary, and brokers who handled sales of the products of the Los Angeles Company in the domestic markets and in Japan. The information petitioner obtained was to the following effect: Brokers stated that the quality of tallow recently shipped to Japan had declined and also, that Japanese business could easily be induced away from the Los Angeles company; the director of sales *357 (formerly a stamp dealer at Marshall Field in Chicago) was not a good trader and did not understand very well and had not learned the marketing of commodities; within the domestic market, representatives of substantial corporations making soap and other products had experienced difficulties with Mortimer, believed he had an unrealistic attitude toward the tallow market, was losing the soapmaking business in Los Angeles, and had poor relations with the trade and competitors; that difficulties within the Los Angeles company's organization and lack of employee initiative were well known among the trade; and that Mortimer was driven by a desire for power, and had an intense jealousy of the Peterson family. Employees and former ones stated that large sums of money were spent for equipment and "systems" which were not commensurate with business obtained or efficient operations; that there was overemphasis of a public relations department; that employee morale was very low and labor turnover was large; that overhe of tallow recently shipped to Japan had declined and also, that Japanese business could easily be induced away from the Los Angeles company; the director of sales (formerly a stamp *358 dealer at Marshall Field in Chicago) was not a good trader and did not understand very well and had not learned the marketing of commodities; within the domestic market, representatives of substantial corporations making soap and other products had experienced difficulties with Mortimer, believed he had an unrealistic attitude toward the tallow market, was losing the soapmaking business in Los Angeles, and had poor relations with the trade and competitors; that difficulties within the Los Angeles company's organization and lack of employee initiative were well known among the trade; and that Mortimer was driven by a desire for power, and had an intense jealousy of the Peterson family. Employees and former ones stated that large sums of money were spent for equipment and "systems" which were not commensurate with business obtained or efficient operations; that there was overemphasis of a public relations department; that employee morale was very low and labor turnover was large; that overhead expenses were inordinately high and there was much waste around the plant of money and manpower; that Mortimer indulged in extravagant expenditures of the corporation's funds for unnecessary personnel *359 and to satisfy his own rather than the corporation's needs; and that Mortimer lacked managerial leadership. Several of the individuals interviewed requested one or more meetings with petitioner; in other instances petitioner initiated the meeting and conference. Petitioner made notes and memoranda of the substance of the conferences; in addition, petitioner carried on correspondence with a former employee who desired to communicate a good deal. Peterson Tallow Company, early in 1958, engaged William B. Logan & Associates to make an industrial survey of a soap manufacturing department which it operated. Early in July 1958, petitioner again consulted the Logan firm about making a management survey of Peterson Manufacturing Company, and he also consulted Stanley C. Smith, a director and vice-president of the Los Angeles company. Petitioner and Smith met with a representative of Logan and discussed how the survey should be made; Smith advised petitioner of his approval of making the survey. On July 28, 1958, petitioner executed, as president of Peterson Manufacturing Company, a contract with the Logan firm to make "a comprehensive examination" of the company's operations to "cover *360 the overall major factors affecting" its volume and profits and financial position, and to outline possible corrections in procedures. It was agreed that the best procedure would be for the Logan representatives to call at the Los Angeles offices with a letter of introduction to Mortimer but without advance notice. The Logan survey was started in Los Angeles on August 18, 1958, and a written report of the survey was completed under date of September 5, 1958. In 1954, a program was started to modernize the Los Angeles plant which included the installation of various kinds of new equipment, and electronic automation procedures which provided push-button rendering, electronic controls for moving raw materials from trucks and for processing and handling the products, and a closed circuit industrial television network throughout the plant with TV control and a screen in the chief engineer's office and a monitor screen in Mortimer's office. Mortimer apparently the survey. On July 28, 1958, petitioner executed, as president of Peterson Manufacturing Company, a contract with the Logan firm to make "a comprehensive examination" of the company's operations to "cover the overall major factors *361 affecting" its volume and profits and financial position, and to outline possible corrections in procedures. It was agreed that the best procedure would be for the Logan representatives to call at the Los Angeles offices with a letter of introduction to Mortimer but without advance notice. The Logan survey was started in Los Angeles on August 18, 1958, and a written report of the survey was completed under date of September 5, 1958. In 1954, a program was started to modernize the Los Angeles plant which included the installation of various kinds of new equipment, and electronic automation procedures which provided push-button rendering, electronic controls for moving raw materials from trucks and for processing and handling the products, and a closed circuit industrial television network throughout the plant with TV control and a screen in the chief engineer's office and a monitor screen in Mortimer's office. Mortimer apparently the survey. On July 28, 1958, petitioner executed, as president of Peterson Manufacturing Company, a contract with the Logan firm to make "a comprehensive examination" of the company's operations to "cover the overall major factors affecting" its volume and *362 profits and financial position, and to outline possible corrections in procedures. It was agreed that the best procedure would be for the Logan representatives to call at the Los Angeles offices with a letter of introduction to Mortimer but without advance notice. The Logan survey was started in Los Angeles on August 18, 1958, and a written report of the survey was completed under date of September 5, 1958. In 1954, a program was started to modernize the Los Angeles plant which included the installation of various kinds of new equipment, and electronic automation procedures which provided push-button rendering, electronic controls for moving raw materials from trucks and for processing and handling the products, and a closed circuit industrial television network throughout the plant with TV control and a screen in the chief engineer's office and a monitor screen in Mortimer's office. Mortimer apparently was the promoter of much of the project, which was written about in two industrial magazines devoted to food processing and the western meat industry. The modernization plan was accomplished before August 1958. The Logan report noted that "Under the capital improvement program of *363 the last several years, the plant facilities are in excellent condition"; that the additions to plant and equipment involved expenditures of about $250,000 a year; and that the "complete modernization program" had increased plant capacity. However, the Logan report stated that the problem was to "Effect reorganization of management and [a] cost reduction program immediately." A 4-page summary of the findings made in the full report is incorporated herein by reference. The full report was critical of the following aspects of the operations of and conditions in the Los Angeles business; financial position; production; competition and procurement; marketing and distribution; and administration. Among the existing arrangements and conditions which were found to be bad for the business, were the following: A 90 percent increase in fixed assets during the preceding 5 years had tied up too much money in fixed assets resulting in a weakened capital position. Excess capacity existed at the plant; "over-mechanization and gadgetry [accounted] for a large part of plant investment - without sufficient increase in productivity;" feather-bedding was predominant throughout the plant; the industrial *364 TV system was unnecessary; "production methods could be vastly improved." The corporation's share of the market had steadily decreased and costs of acquiring raw materials had steadily increased. The Los Angeles corporation competed with Peterson Tallow Company in the San Francisco market, which the Logan report described as "ridiculous." Cost accounting was nonexistent; cost of the Remington Rand mechanized accounting system was excessive in relation to output of useful data; simple management controls were not evident and cost controls as such were lacking; the expense control was inadequate. There was no comptroller in the Los Angeles corporation, and since the general manager (Mortimer) was also the executive vice-president and treasurer, the introduction of a comptroller would be a means of tightening finances and management controls. Earnings of the Los Angeles business during 15 years (1943-1957, inclusive) were 50 percent below those of Peterson Tallow Company for the same period, and the lack of a definite pattern of earnings over the years (instead of fluctuations) were evidence of unsatisfactory management policy. The truck driver conspiracy reflected poorly on management *365 control of the situation, and the other irregularities spoke poorly of the present manager. Continued competition plus low profits made it "imperative" to take immediate action "to bring profits up to par." The report found, further, that actual achievements in delegation of authority did not exist; neither did confidence and trust among members of the firm toward each other; real loyalty of employees toward management was questionable; communications from management down to foremen and employees, and vice versa, did not exist, and the philosophy of the present management was autocratic. Finally, the present management had failed to produce at optimum levels and, also, to keep the name of the corporation respected in the local community. Mortimer did not have the opportunity to read the Logan report until September 25, 1958. In the meantime, he had proposed that the Los Angeles corporation purchase a warehouse facility at the Los Angeles harbor, known as the Comco property, which would cost about $75,000. Stanley C. Smith made an independent investigation and concluded it was an inadvisable project to undertake at the time, and he advised Mortimer that Robert Peterson also was opposed. *366 The proposal was considered at a meeting of the directors on September 16, 1963. Robert opposed having the corporation enter the field of warehousing, a service business; stated that he believed the storage facilities at the plant in Los Angeles were adequate; and that he was opposed to the expense. A resolution to approve the undertaking was proposed by Leslie C. Turner, a director, and adopted by a 3 to 2 vote; Robert and Smith (the directors in Oakland) voted "No," and Bisher, Turner, and Mortimer (the Los Angeles directors) voted "Yes." At a subsequent meeting on October 7, 1958, the directors rescinded the above resolution, unanimously, Mortimer not voting. At a luncheon meeting on September 24, 1958, petitioner and Stanley C. Smith met with representatives of Logan to discuss Logan's findings. The Logan men recommended removing Mortimer from his posts of executive vice-president and general manager, or if that could not be done, of reorganizing the Los Angeles company and placing Mortimer in the post of chairman of the board of directors and stripping him of his powers. The Logan men also reported their extreme concern about the financial condition of the company, and about *367 the embezzlements. It was their opinion that the corporation was losing about $250,000 a year in its operations because of the general management, and that a serious condition existed which, if not remedied, eventually would cause failure of the business. During the afternoon of September 24, 1958, a meeting was held in San Francisco in the Logan firm's offices attended by petitioner, Mortimer, the general manager of Logan and an associate (but not attended by Stanley C. Smith), at which the general manager read the summary of the Logan report on its survey of the Los Angeles business and a copy of the full report was given to Mortimer, who requested one week to study the report and present his answer about what he proposed doing in relation to the report. When petitioner began making inquiries in 1958 about the management of the Los Angeles company, it was not his purpose to lay a foundation for the removal of Mortimer. His primary interest was reorganization of the plant so that the business could earn the potential profits which he knew were possible. Moreover, he did not think it would be an easy matter to remove Mortimer or that Mortimer might be willing to resign. Mortimer *368 was not asked to resign at the meeting on September 24, 1958, and he did not indicate at that time that he would consider doing so. On the other hand, relations between petitioner and Mortimer had become strained and there was a serious conflict in the respective views of each with respect to managerial policies and philosophy. The conflict became acute when petitioner sent Mortimer the letter dated July 25, 1957, and continued to be thereafter. As a result of the investigations of petitioner and Logan & Associates, petitioner concluded that Mortimer was almost totally incompetent as a manager. Stanley C. Smith was fully aware of the conflict between these men but he believed it would be difficult to remove Mortimer and as of the morning of September 24th, Smith had the view that a way would have to be found to resolve the conflicts, which might not involve removing Mortimer, so that the Los Angeles business could be put back into a position to make money. Up to September 24, 1958, there had not been any discussion about getting Mortimer out of the business, or of buying out anybody. On September 24th, immediately after the meeting with the Logan people and petitioner, Mortimer *369 went directly over to Oakland to see Stanley J. Smith. He saw Stanley J. and Stanley C. Smith; announced that there was not room in the Los Angeles corporation for both Robert and himself; that he would not discuss further the Logan report; that either he would buy all of the shares of Robert and the Peterson Trust, or would sell all of his shares to Robert; and that he would return to the Smith office in a week with definite proposals. The Purchase of Mortimer's Shares: After the above meeting, Mortimer consulted a brokerage firm about the fair market value of the stock of Peterson Manufacturing Company and arrived at a value of $1,500 per share. The book value per share was $1,389.33. He had two forms of an option agreement prepared by J. Stuart Neary in the Los Angeles law firm of Gibson, Dunn, & Crutcher (without consulting petitioner); in one he was the seller and in the other he was the buyer. On October 1, there was a meeting in the Smith law office of Mortimer, petitioner and the Smiths, at which Mortimer presented two option agreements and fixed the price for whichever transaction might be agreed to at $1,500 per share. Robert had been advised by independent advisers about *370 the fair market value of the stock and under all of the circumstances agreed to the price fixed by Mortimer. At $1,500 per share, the selling price of Mortimer's 375 shares was $562,500. Petitioner did not intend to purchase all of Mortimer's shares. Members of the Peterson family, the trust, and himself were to purchase about two-thirds and it was intended that the corporation would redeem about one-third. However, it was petitioner's belief that under all of the circumstances, the suddenness of Mortimer's proposal, and the need of the corporation to be relieved of Mortimer's participation in and management of its business, time was of the essence and it was necessary to have Mortimer legally committed at once to selling his shares at a fixed and reasonable price. Moreover, Mortimer had told the Smiths that he would not resign from his offices and position in the corporation and from his trusteeship of the Peterson Trust until he received payment in full for his shares. The form of the option agreement in which Mortimer agreed to sell his shares (prepared by Neary and Mortimer) did not accurately reflect the situation in that it recited that Robert offered to purchase Mortimer's *371 shares, whereas, in fact, Mortimer had offered to sell his shares. Prior to the meetings of September 24 and October 1, Robert had not offered to buy Mortimer's shares; Mortimer had initiated the proposal. Furthermore, Robert had not made arrangements for financing the purchase. Nevertheless, Robert elected to act immediately and to execute the option agreement wherein Mortimer agreed to sell his shares and Robert was named as the purchaser because of the circumstances set forth above. He required Mortimer to execute the agreement at once so that Mortimer would be committed. Accordingly, on October 1, Robert executed the option agreement; Mortimer signed this acceptance; and the Smiths signed it as witnesses of Mortimer's acceptance. Robert executed the agreement as a temporary expedient. He was convinced that it was necessary, in order to save the corporation's business and prevent further impairment, that Mortimer's connections with it should end which would be accomplished if Mortimer were committed immediately to sell his shares. In executing the agreement, Robert was in fact acting for a syndicate or group which would purchase about one-third of Mortimer's shares, and as president *372 of the corporation, which would redeem about one-third. He intended to purchase only about one-third, himself. When Mortimer executed the agreement he did not know and did not care whether petitioner was or others were buying his shares. In offering these shares to Robert, he was fulfilling a promise he had made to Nels Peterson in 1948 to make the first offer of his shares to Robert and Nels Hamberg when the time came for making disposition of them in the event of his death, or prior separation from the corporation. In this connection, Robert executed the option agreement; Mortimer signed this acceptance; and the Smiths signed it as witnesses of Mortimer's acceptance. Robert executed the agreement as a temporary expedient. He was convinced that it was necessary, in order to save the corporation's business and prevent further impairment, that Mortimer's connections with it should end which would be accomplished if Mortimer were committed immediately to sell his shares. In executing the agreement, Robert was in fact acting for a syndicate or group which would purchase about one-third of Mortimer's shares, and as president of the corporation, which would redeem about one-third. He *373 intended to purchase only about one-third, himself. When Mortimer executed the agreement he did not know and did not care whether petitioner was or others were buying his shares. In offering these shares to Robert, he was fulfilling a promise he had made to Nels Peterson in 1948 to make the first offer of his shares to Robert and Nels Hamberg when the time came for making disposition of them in the event of his death, or prior separation from the corporation. In this connection, Mortimer had included the same direction to his executor in his will. On October 1, Mortimer was only interested in obtaining $1,500 per share and $562,500, for all of his shares. Mortimer's option agreement provided that the purchase price was to be paid in 30 days. On October 3, Mortimer deposited his stock certificate for 375 shares in an escrow account at the International Branch in Los Angeles of the Bank of America with a stock power endorsed to Robert. The escrow was for a period ending November 4, 1958, and Mortimer's instructions to the bank were that the stock certificate and power were to be delivered during that period to Robert upon receipt of $562,500. The transaction had to be consummated *374 by November 4. On October 2, 1958, Robert discussed with Kendrick B. Morrish, vice-president, at the Oakland Office of American Trust Company the need for loans, presented his plan for financing the purchase of Mortimer's shares, and fully advised him of the background of Mortimer's offer and about the managerial and earnings problems of Peterson Manufacturing Company. Morrish was well acquainted with Robert, his family, and Peterson Tallow Company; all had carried on their banking business since 1933 with American Trust and had maintained excellent records. Robert told Morrish of the circumstances under which he had executed the option agreement on the preceding day; that it had not been and was not his intention to purchase all of Mortimer's shares; and about how the shares would be purchased, as follows: One-third by members of the family and the trust; one-third by the corporation for redemption; and one-third by himself. Robert's plan was as follows: A temporary loan of $562,500 would be made immediately to himself, to be paid by American Trust to Bank of America to take up Mortimer's offer and to facilitate Mortimer's immediate resignations from the corporation and the trust; *375 that this temporary loan would be amply secured by pledges of stock of the Los Angeles and Emeryville corporations and listed securities owned by Robert, and would be liquidated in about 30 days by cash payments of the individual purchasers and the trust, and by applying funds to be borrowed from American Trust under long-term loans, one to Peterson Manufacturing Company, one to Peterson Tallow Company, and another to Robert, individually. Robert agreed to move to Los Angeles and take over the management of Peterson Manufacturing Company as soon as Mortimer's resignations could be obtained, leaving Nels Hamberg in charge of Peterson Tallow Company, and to arrange to transfer a substantial part of the banking business of the Los Angeles corporation from Bank of America to American Trust. As the Los Angeles corporation was then indebted to Bank of America for about $200,000, it was proposed that the long-term loan to Peterson Manufacturing Company would be about $400,000 to enable it both to liquidate its debt to Bank of America and to redeem about one-third of the Mortimer shares without impairing its working capital. Robert told Morrish that he intended purchasing about $150,000 of *376 the Mortimer block of stock; that he could pay $50,000 in cash for such amount and would need a personal long-term loan of $100,000 for which he would pledge with the bank listed securities owned by himself and his wife having a then market value of $163,000. Morrish agreed that Robert's assets would justify a long-term for his personal account of from $100,000 to $125,000. Peterson Tallow Company owed $35,000 to Robert and the same amount to Nels Hamberg. A loan to Peterson Tallow of at least $70,000 was proposed so that Robert and Nels would collect the amounts owing to them and apply the funds to their respective purchases of portions of the Mortimer shares. One-third of the Mortimer block of stock represented 125 shares. Robert's plan on October 1 was, therefore, that he would purchase about 125 shares for his own account, the trust and members of the family would purchase about the same number, and the corporation would redeem about the same number. That was the understanding of Morrish on October 2, and of the loan officers of American Trust from the start, and the proposals for the temporary loan and the long-term loans were considered on that basis on October 2, and thereafter, *377 until the entire plan was put into operation. On October 6 and 10, 1958, Morrish submitted to his senior officers two memoranda setting forth the entire plan for the purchases of the Mortimer block of stock and the temporary and long-term loans. The memoranda designated the proposed borrowers as Peterson Tallow Company, Peterson Manufacturing Company, and Robert Peterson, individually. The memoranda are incorporated herein by reference. Morrish stated in his October 6 memorandum that the reason for buying out Mortimer was the management collect the amounts owing to them and apply the funds to their respective purchases of portions of the Mortimer shares. One-third of the Mortimer block of stock represented 125 shares. Robert's plan on October 1 was, therefore, that he would purchase about 125 shares for his own account, the trust and members of the family would purchase about the same number, and the corporation would redeem about the same number. That was the understanding of Morrish on October 2, and of the loan officers of American Trust from the start, and the proposals for the temporary loan and the long-term loans were considered on that basis on October 2, and thereafter, *378 until the entire plan was put into operation. On October 6 and 10, 1958, Morrish submitted to his senior officers two memoranda setting forth the entire plan for the purchases of the Mortimer block of stock and the temporary and long-term loans. The memoranda designated the proposed borrowers as Peterson Tallow Company, Peterson Manufacturing Company, and Robert Peterson, individually. The memoranda are incorporated herein by reference. Morrish stated in his October 6 memorandum that the reason for buying out Mortimer was the management collect the amounts owing to them and apply the funds to their respective purchases of portions of the Mortimer shares. One-third of the Mortimer block of stock represented 125 shares. Robert's plan on October 1 was, therefore, that he would purchase about 125 shares for his own account, the trust and members of the family would purchase about the same number, and the corporation would redeem about the same number. That was the understanding of Morrish on October 2, and of the loan officers of American Trust from the start, and the proposals for the temporary loan and the long-term loans were considered on that basis on October 2, and thereafter, *379 until the entire plan was put into operation. On October 6 and 10, 1958, Morrish submitted to his senior officers two memoranda setting forth the entire plan for the purchases of the Mortimer block of stock and the temporary and long-term loans. The memoranda designated the proposed borrowers as Peterson Tallow Company, Peterson Manufacturing Company, and Robert Peterson, individually. The memoranda are incorporated herein by reference. Morrish stated in his October 6 memorandum that the reason for buying out Mortimer was the management problem and that Robert's acceptance of Mortimer's offer to sell was on a very temporary basis; that within 30 days members of the family and the trust would acquire about $150,000 of the shares, Robert would acquire for his own account about $150,000 of the shares and borrow about $100,000 for that purpose; and the corporation would retire $262,500 of the shares. The memorandum proposed loaning Peterson Manufacturing Company $487,500 of which $225,000 would be used to pay the debt to Bank of America, and $262,500 would be used to retire that amount of the Mortimer stock, which amount would be applied to the temporary loan of $562,500. In his supplemental *380 October 8 memorandum, Morrish stated that a 5-year loan would be made to Peterson Manufacturing Company in the amount of $400,000 of which $200,000 would be paid to Bank of America, and $200,000 would be applied in retiring that amount of the Mortimer stock; that a 6-month loan of $70,000 would be made to Peterson Tallow Company; that a long-term loan of $100,000 would be made to Robert; and that within 30 days the temporary loan of $562,500 would be discharged by cash payments from the individual purchasers and the trust and application of the subsequent long-term loans of $200,000 to the corporation, and $100,000 to Robert. The latter was the substance of the financing. On or about October 15, 1958, American Trust approved the temporary loan of $562,500 and the entire plan involving a 5-year loan of $400,000 to the corporation, a 6-month loan of $70,000 to Peterson Tallow Company, and a long-term loan of $100,000 to Robert, individually. The bank approved the temporary loan of $562,500 as a temporary expedient and as the only way by which the transaction with Mortimer could be consummated because Robert's assets and earnings were insufficient to support a long-term loan to him *381 of that large sum. In fact, Robert never intended to assume personal liability for a loan of $562,500, which the bank understood. The bank approved the plan for the respective long-term loans in about the above amounts to the corporation and to Robert, individually, as the substantive financing of the whole transaction, and received a list of the individual subscribers and purchasers and assurance of their ability to pay about $262,500 in cash up to the amounts of the respective longterm loans of $300,000. On October 15, Robert requested Mortimer to substitute in the escrow account with Bank of America a stock power endorsed in blank with his signature guaranteed by Bank of America, and to authorize that bank to deliver the certificate for 375 shares to either himself or American Trust Company upon payment of $562,500. Robert and his wife executed a shortterm note to American Trust for $562,500, at 4 1/2 percent interest, dated October 14, 1958, and due April 13, 1959, which note was subsequently replaced by a note of Robert and Martha for $125,000. American Trust delivered its cashier's check dated October 20, 1958, to Bank of America for $562,500, and received in exchange Mortimer's *382 certificate for 375 shares and the stock power endorsed in blank. Mortimer received the above sum from Bank of America. American Trust held the certificate for 375 shares pending receipt of the cash payments from the Peterson Trust and the individual purchasers and the payment of Peterson Manufacturing Company for the number of shares to be purchased and redeemed. At a special meeting of the directors of Peterson Manufacturing Company on October 21, 1958, Mortimer resigned from the board and all of the corporate offices he held and from the position of general manager. Dale Rycraft resigned from the office of corporate secretary. Nels Hamberg was elected director and secretary-treasurer; Donald E. Heddleston, an employee, was elected assistant secretary. In connection with Mortimer's resignation, his three assistants resigned from their jobs; Rycraft, assistant general manager; Howard Wallace, director of personnel; and George Jackson, director of research and development. Robert Peterson immediately became the general manager of the Los Angeles corporation and moved his residence to the Los Angeles area, where he still lives. During November and December the longterm, as distinguished *383 from the short-term, financing was arranged; the final details were settled; and the individual purchasers made cash payments to American Trust which were applied in reduction of the temporary loan of $562,500. There were slight delays due to the court procedures involved in Mortimer's resignation as a trustee of the Peterson Trust, the absence of petitioner's sister, Patricia Janney, who was away on a trip, and the necessity of Robert's presence in Los Angeles. The trust purchased 40 shares and board and all of the corporate offices he held and from the position of general manager. Dale Rycraft resigned from the office of corporate secretary. Nels Hamberg was elected director and secretary-treasurer; Donald E. Heddleston, an employee, was elected assistant secretary. In connection with Mortimer's resignation, his three assistants resigned from their jobs; Rycraft, assistant general manager; Howard Wallace, director of personnel; and George Jackson, director of research and development. Robert Peterson immediately became the general manager of the Los Angeles corporation and movel hisdresidence to the Los Angeles area, where he still lives. During November and December the longterm, *384 as distinguished from the short-term, financing was arranged; the final details were settled; and the individual purchasers made cash payments to American Trust which were applied in reduction of the temporary loan of $562,500. There were slight delays due to the court procedures involved in Mortimer's resignation as a trustee of the Peterson Trust, the absence of petitioner's sister, Patricia Janney, who was away on a trip, and the necessity of Robert's presence in Los Angeles. The trust purchased 40 shares and certain individuals purchased 86 shares(126); Robert purchased 121 shares; and the corporation purchased and redeemed 128 shares which it held thereafter in its treasury. Thus, the 3 participants acquired approximately(more or less) one-third, each, of the Mortimer stock, as Robert had intended on October 1, and had advised Moorish. On December 4, 1958, American Trust received cash payments of $154,000 from the following: $76,500 from Nels Hamberg in full payment for 51 shares; $22,500 from Myrtle Peterson in full payment for 15 shares; and $55,000 from Robert in part payment for 121 shares. On December 8, the bank received $15,000 from Anna Hamberg in full payment for 10 *385 shares. On December 24, the bank received $1,500 from Robert in part payment for his 121 shares. In December the bank made a 5-year loan of $400,000 to Peterson Manufacturing Company guaranteed under a continuing guaranty agreement with the bank executed on October 29, 1958, by Peterson Tallow Company. Of this amount, $200,000 was used to pay the then balance of the indebtedness of Peterson Manufacturing Company to Bank of America in Los Angeles, and $192,000 was used to purchase and redeem 128 shares out of Mortimer's 375 shares at $1,500 per share. This $192,000 was applied against the temporary loan of $562,500. As of December 31, 1958, all of the above payments to American Trust totaled $362,500 and reduced the temporary loan of $562,500 to $200,000. Patricia Janney and the Peterson Trust could not make payment for shares until January 1959. On December 30, 1958, the Superior Court of Alameda County entered its order accepting the resignation of Mortimer, dated December 2, 1963, as a trustee of the Nels Peterson Trust. Robert Peterson and Stanley C. Smith were then the remaining trustees. The trust sold some bonds to obtain cash to purchase 40 shares out of Mortimer's shares. *386 On January 5, 1959, the trust paid $60,000 to American Trust in full payment for 40 shares of the Mortimer stock. On January 26, 1959, Patricia Janney paid the bank $15,000 in full for 10 shares. As of January 26, 1959, all of the subscribers to the Mortimer shares had paid American Trust the full amount of each subscription except Robert who had paid $56,500 in cash and owed $125,000 on his purchase of 121 shares. Robert personally borrowed from American Trust $125,000 128 shares out of Mortimer's 375 shares at $1,500 per share. This $192,000 was applied against the temporary loan of $562,500. As of December 31, 1958, all of the above payments to American Trust totaled $362,500 and reduced the temporary loan of $562,500 to $200,000. Patricia Janney and the Peterson Trust could not make payment for shares until January 1959. On December 30, 1958, the Superior Court of Alameda County entered its order accepting the resignation of Mortimer, dated December 2, 1963, as a trustee of the Nels Peterson Trust. Robert Peterson and Stanley C. Smith were then the remaining trustees. The trust sold some bonds to obtain cash to purchase 40 shares out of Mortimer's shares. On January 5, 1959, the *387 trust paid $60,000 to American Trust in full payment for 40 shares of the Mortimer stock. On January 26, 1959, Patricia Janney paid the bank $15,000 in full for 10 shares. As of January 26, 1959, all of the subscribers to the Mortimer shares had paid American Trust the full amount of each subscription except Robert who had paid $56,500 in cash and owed $125,000 on his purchase of 121 shares. Robert personally borrowed from American Trust $125,000 to finance the balance of his subscription and purchase. He and his wife executed a note in the amount of $125,000, at 4 1/2 percent interest, and pledged with the bank as collateral their listed securities in corporations other than the Peterson corporations having a total market value in excess of $125,000, and 250 shares of stock of Peterson Manufacturing Company and 5,375 shares of stock of Peterson Tallow Company. Robert reduced this loan to $90,000 as of October 1962, and he has continued making payments in reduction of the loan. American Trust on its books credited the loan account set up for the temporary loan of $562,500 in October 1958 with the amount of the loan to Robert of $125,000, which extinguished that loan. To summarize: *388 the temporary loan of $562,500 was extinguished by the following credits in that loan account: Anna Hamberg
10 shs., cash
$ 15,000
Nels Hamberg
51 shs., cash
76,500
Patricia Janney
10 shs., cash
15,000
Myrtle Peterson
15 shs., cash
22,500
Peterson Trust
40 shs., cash
60,000
Robert Peterson
121 shs., cash
$ 56,500
1-t. loan
125,000
181,500
Peterson Mfg. Co.
128 shs., 1-t. loan
192,000
375 shs.
$562,500 The transaction with Mortimer was financed by the temporary loan of $562,500. That loan was extinguished by cash payments by the individual subscribers and the trust in the total amount of $245,500; by part of the proceeds of a 5-year loan to Peterson Manufacturing Company, $192,000; and by the proceeds of a long-term loan to Robert of $125,000. The above loans to the corporation and Robert, respectively, were carried in separate loan accounts on the books of American Trust. As of February 3, 1960, the loan of $400,000 to the corporation was paid in full, in less than 2 years. The Mortimer certificate evidencing 375 shares was held by American Trust until sometime in December 1958 when the bank surrendered *389 it to Peterson Manufacturing Company. The corporation issued in respect of this certificate, 7 new certificates during December to the purchasers of the Mortimer shares, and the Mortimer certificate was cancelled on December 31, 1958. In the corporation's stock record, the transferor of the shares to the respective purchasers is Mortimer. Out of the 375 shares, the only certificate which was issued to Robert was the certificate evidencing 121 shares. The following schedule shows who purchased the 375 shares sold by Mortimer, the number of shares purchased and the amount paid by each, the certificates issued to evidence the purchases and the dates: Certif.
Date of
No. of
Am't
No.
Certif.
Seller
Buyer
Shares
Paid
5
12/ 8/58
Mortimer
Nels Hamberg
51
$ 76,500
6
12/ 8/58
Mortimer
Myrtle Peterson
15
22,500
7
12/ 8/58
Mortimer
Anna Hamberg
10
15,000
8
12/20/58
Mortimer
Patricia Janney
10
15,000
10
12/31/58
Mortimer
N. Peterson Trust
40
60,000
126
$189,000
9
12/31/58
Mortimer
Robert Peterson
121
181,500
11
12/31/58
Mortimer
Peterson Mfg. Co.
128
192,000
375
$562,500
*390 Each amount shown above as "Amount Paid" was paid by of the shares to the respective purchasers is Mortimer. Out of the 375 shares, the only certificate which was issued to Robert was the certificate evidencing 121 shares. The following schedule shows who purchased the 375 shares sold by Mortimer, the number of shares purchased and the amount paid by each, the certificates issued to evidence the purchases and the dates: Certif.
Date of
No. of
Am't
No.
Certif.
Seller
Buyer
Shares
Paid
5
12/ 8/58
Mortimer
Nels Hamberg
51
$ 76,500
6
12/ 8/58
Mortimer
Myrtle Peterson
15
22,500
7
12/ 8/58
Mortimer
Anna Hamberg
10
15,000
8
12/20/58
Mortimer
Patricia Janney
10
15,000
10
12/31/58
Mortimer
N. Peterson Trust
40
60,000
126
$189,000
9
12/31/58
Mortimer
Robert Peterson
121
181,500
11
12/31/58
Mortimer
Peterson Mfg. Co.
128
192,000
375
$562,500 Each amount shown above as "Amount Paid" was paid by each purchaser listed and is the amount for which each intended to and did subscribe. Peterson Manufacturing Company paid American Trust $192,000 for 128 shares of its stock. *391 However, this amount in substance was paid to Mortimer. Certificate No. 11 evidencing 128 shares was issued to Peterson Manufacturing Company on December 31, 1958; these shares have been held by the corporation since then as treasury shares. The corporation did not deduct in its income tax return $192,000, or any portion thereof, as an expense deduction against income. On its books, the corporation noted a charge of $192,000 against earned surplus in its reconciliation thereof. The corporation paid $192,000 in redemption of 128 shares. The balance sheet of the corporation for the year ended December 31, 1958, shows its redemption of 128 shares as follows: Capital stock, par $10; issued 1,000
shs.; repurchased and held in
treasury 128 shares; outstanding
872 shs.
$ 10,000.00
Capital Surplus (No change in each purchaser listed and is the amount for which each intended to and did subscribe. Peterson Manufacturing Company paid American Trust $192,000 for 128 shares of its stock. However, this amount in substance was paid to Mortimer. Certificate No. 11 evidencing 128 shares was issued to Peterson Manufacturing Company on December 31, 1958; these shares have been held by the corporation since then as treasury shares. The corporation did not deduct in its income tax return $192,000, or any portion thereof, as an expense deduction against income. On its books, the corporation noted a charge of $192,000 against earned surplus in its reconciliation thereof. The corporation paid $192,000 in redemption of 128 shares. The balance sheet of the corporation for the year ended December 31, 1958, shows its redemption of 128 shares as follows: *392 Capital stock, par $10; issued 1,000
shs.; repurchased and held in
treasury 128 shares; outstanding
872 shs.
$ 10,000.00
Capital Surplus (No change in each purchaser listed and is the amount for which each intended to and did subscribe. Peterson Manufacturing Company paid American Trust $192,000 for 128 shares of its stock. However, this amount in substance was paid to Mortimer. Certificate No. 11 evidencing 128 shares was issued to Peterson Manufacturing Company on December 31, 1958; these shares have been held by the corporation since then as treasury shares. The corporation did not deduct in its income tax return $192,000, or any portion thereof, as an expense deduction against income. On its books, the corporation noted a charge of $192,000 against earned surplus in its reconciliation thereof. The corporation paid $192,000 in redemption of 128 shares. The balance sheet of the corporation for the year ended December 31, 1958, shows its redemption of 128 shares as follows: Capital stock, par $10; issued 1,000
shs.; repurchased and held in
treasury 128 shares; outstanding
872 shs.
$ 10,000.00
Capital Surplus (No change in
year)
180,329.62
Earned Surplus
$1,149,425.32
Less Cost treas, stock,
128 shs.
192,000.00
957,425.32
$1,147,754.94
*393 The board of directors of Peterson Manufacturing Company met on December 18, 1958, and petitioner, as president, gave the directors a detailed report about the events of the preceding months, since May, the steps he had taken, the problems arising from Mortimer's management, Mortimer's offer to sell all of his shares, and the arrangements followed to consummate the transaction under the option given by Mortimer. Following petitioner's report, the directors adopted the following resolutions: NOW, THEREFORE, BE IT RESOLVED: That this corporation purchase 128 shares of its common capital stock acquired from Richard B. Mortimer out of earned surplus of this corporation, and hold the same as treasury shares; and BE IT FURTHER RESOLVED: That Robert N. Peterson, the President, and Nels A. Hamberg, the Secretary of this corporation, be and they are hereby
year) 180,329.62
Earned Surplus $1,149,425.32
Less Cost treas, Stock,
128 shs. 192,000.00 957,425.32 $1,147,754.94 The board of directors of Peterson Manufacturing Company met on December 18, 1958, and petitioner, as president, gave the directors a detailed report about the events of the preceding months, since May, the steps *394 he had taken, the problems arising from Mortimer's management, Mortimer's offer to sell all of his shares, and the arrangements followed to consummate the transaction under the option given by Mortimer. Following petitioner's report, the directors adopted the following resolutions: NOW, THEREFORE, BE IT RESOLVED: That this corporation purchase 128 shares of its common capital stock acquired from Richard B. Mortimer out of earned surplus of this corporation, and hold the same as treasury shares; and BE IT FURTHER RESOLVED: That Robert N. Peterson, the President, and Nels A. Hamberg, the Secretary of this corporation, be and they are hereby
year) 180,329.62
Earned Surplus $1,149,425.32
Less Cost treas, Stock,
128 shs. 192,000.00 957,425.32 $1,147,754.94 The board of directors of Peterson Manufacturing Company met on December 18, 1958, and petitioner, as president, gave the directors a detailed report about the events of the preceding months, since May, the steps he had taken, the problems arising from Mortimer's management, Mortimer's offer to sell all of his shares, and the arrangements followed to consummate the transaction under the option given by Mortimer. Following *395 petitioner's report, the directors adopted the following resolutions: NOW, THEREFORE, BE IT RESOLVED: That this corporation purchase 128 shares of its common capital stock acquired from Richard B. Mortimer out of earned surplus of this corporation, and hold the same as treasury shares; and BE IT FURTHER RESOLVED: That Robert N. Peterson, the President, and Nels A. Hamberg, the Secretary of this corporation, be and they are hereby
year) 180,329.62
Earned Surplus $1,149,425.32
Less Cost treas, Stock,
128 shs. 192,000.00 957,425.32 $1,147,754.94 The board of directors of Peterson Manufacturing Company met on December 18, 1958, and petitioner, as president, gave the directors a detailed report about the events of the preceding months, since May, the steps he had taken, the problems arising from Mortimer's management, Mortimer's offer to sell all of his shares, and the arrangements followed to consummate the transaction under the option given by Mortimer. Following petitioner's report, the directors adopted the following resolutions: NOW, THEREFORE, BE IT RESOLVED: That this corporation purchase 128 shares of its common capital stock acquired from Richard B. Mortimer out *396 of earned surplus of this corporation, and hold the same as treasury shares; and BE IT FURTHER RESOLVED: That Robert N. Peterson, the President, and Nels A. Hamberg, the Secretary of this corporation, be and they are hereby authorized and empowered for and on behalf of and in the name of this corporation and as its corporate act and deed to purchase said 128 shares of the common capital stock of this corporation for the sum of $1,500.00 for each share, and to execute any and all papers required or advisable to consummate said purchase, and to execute notes or any documents necessary or advisable and deliver security in connection with the borrowing of funds to finance the purchase of said shares; and BE IT FURTHER RESOLVED: That this corporation pay any and all expenses incurred in connection with the acquisition of the said shares of Richard B. Mortimer, and any officer of this corporation be and he is hereby authorized and empowered to disburse funds in payment of such obligations; BE IT FURTHER RESOLVED: That each and all of the acts of said Robert N. Peterson performed for and on behalf of this corporation for the purchase and acquisition of said shares from [of] this corporation *397 from Richard B. Mortimer are hereby confirmed, ratified authorized and empowered for and on behalf of and in the name of this corporation and as its corporate act and deed to purchase said 128 shares of the common capital stock of this corporation for the sum of $1,500.00 for each share, and to execute any and all papers required or advisable to consummate said purchase, and to execute notes or any documents necessary or advisable and deliver security in connection with the borrowing of funds to finance the purchase of said shares; and BE IT FURTHER RESOLVED: That this corporation pay any and all expenses incurred in connection with the acquisition of the said shares of Richard B. Mortimer, and any officer of this corporation be and he is hereby authorized and empowered to disburse funds in payment of such obligations; BE IT FURTHER RESOLVED: That each and all of the acts of said Robert N. Peterson performed for and on behalf of this corporation for the purchase and acquisition of said shares from [of] this corporation from Richard B. Mortimer are hereby confirmed, ratified and approved as the acts of this corporation. Immediately upon assuming the responsibilities of general *398 manager of the corporation, petitioner commenced a program of reducing what he considered to be unnecessary expenses, including the industrial closed circuit television system in the plant and various procedures which Mortimer had installed which were not worth the expenses entailed. In less than 6 months he eliminated expenses in excess of $22,000 per month, which savings had an immediate and lasting effect in increasing the corporation's profits. The following comparisons illustrate the overall improvements in the corporation's financial position after petitioner became the general manager: The corporation showed losses in September and October 1958 in the respective amounts of $23,588 and $132,484, but in November and December it made profits respectively of $17,040 and $14,796. For the year 1958, it made a profit of only $16,175 (having realized a net recovery in 1958 of $63,025 of the embezzlements in prior years); but for 1959, the first full year under petitioner's management, it realized a profit of $217,368. During the 3 years preceding 1958, during 1955-1957, average earnings after taxes were less than $75,000 per year. After the change in management, during the 3 years 1959-1961, the *399 average earnings after taxes were in excess of $255,000 per year, or over 3 times the amount of the average earnings per year during the period 1955-1957. In the 3 years 1955-1957, the corporation paid Federal taxes averaging only $65,000 a year; but for the 3 years 1959-1961 the Federal taxes paid by the corporation averaged in excess of $260,000 per year. Dividends of only $40,000 were paid for both of the years 1955 and 1956, and no dividends were paid in 1957 and 1958. Approximately $133,000 in dividends were paid on 872 shares in 1959-1961, the 3 years following the change of management. For Peterson Manufacturing Company, the following schedule shows for the 8 years 1954-1961, inclusive, sales and net profit or loss before and after Federal income taxes: Profit
Profit
Year
Sales
Before Tax
After Tax
1954
$3,822,962
$324,250
$161,188
1955
4,405,472
165,580
84,983
1956
5,147,578
93,891
55,890
1957
5,272,053
156,279
80,133
1958
4,828,419
(39,878) *
(46,850) *
1959
4,731,865
429,176
217,368
1960
4,804,740
467,451
230,172
1961
5,245,731
654,200
319,529
*400 Comparison of net profit for the years 1957 and 1961, when sales were about the same, ($5,272,053 in 1957 and $5,245,731 in 1961) shows that the corporation's profits in 1961 were $497,921 (before taxes) and $239,396 (after taxes) more than in 1957: Profit
Profit
Year
Sales
Before Tax
After Tax
1961
$5,245,731
$654,200
$319,529
1957
5,272,053
156,279
80,133
1961 Excess
$497,921
$239,396
In 1955, sales were $4,405,472. In 1959, 1960, and 1961, sales were $4,731,865, $4,804,740, and $5,245,731. The following schedule shows the substantial increase in net profit (before and after taxes) in 1959, 1960, and 1961, compared with 1955: Comparison
Profit
Profit
Year
Sales
Before Tax
After Tax
1959
$4,731,865
$429,176
$217,368
1955
4,405,472
165,580
84,983
1959 Increase
$263,596
$132,385
1960
$4,804,740
$467,451
$230,172
1955
4,405,472
165,580
84,983
1960 Increase
$301,871
$145,189
1961
$5,245,731
$654,200
$319,529
Profit
Profit
Year
Sales
Before Tax
After Tax
1961
$5,245,731
$654,200
$319,529
1957
5,272,053
156,279
80,133
1961 Excess
$497,921
$239,396
*401 In 1955, sales were $4,405,472. In 1959, 1960, and 1961, sales were $4,731,865, $4,804,740, and $5,245,731. The following schedule shows the substantial increase in net profit (before and after taxes) in 1959, 1960, and 1961, compared with 1955: Comparison
Profit
Profit
Year
Sales
Before Tax
After Tax
1959
$4,731,865
$429,176
$217,368
1955
4,405,472
165,580
84,983
1959 Increase
$263,596
$132,385
1960
$4,804,740
$467,451
$230,172
1955
4,405,472
165,580
84,983
1960 Increase
$301,871
$145,189
1961
$5,245,731
$654,200
$319,529
Profit
Profit
Year
Sales
Before Tax
After Tax
1961
$5,245,731
$654,200
$319,529
1957
5,272,053
156,279
80,133
1961 Excess
$497,921
$239,396
In 1955, sales were $4,405,472. In 1959, 1960, and 1961, sales were $4,731,865, $4,804,740, and $5,245,731. The following schedule shows the substantial increase in net profit (before and after taxes) in 1959, 1960, and 1961, compared with 1955: Comparison
Profit
Profit
Year
Sales
Before Tax
After Tax
1959
$4,731,865
$429,176
$217,368
1955
4,405,472
165,580
84,983
1959 Increase
$263,596
$132,385
1960
$4,804,740
$467,451
$230,172
1955
4,405,472
165,580
84,983
1960 Increase
$301,871
$145,189
1961
$5,245,731
$654,200
$319,529
1955
4,405,472
165,580
84,983
1961 Increase
$488,620
$234,546
*402 The corporation's net earnings steadily decreased from 1954 earnings of $324,250, before taxes, to a net operating loss in 1958 (before adjustment for the net embezzlement recovery) of $39,878. Logan & Associates estimated that the corporation was losing about $250,000 a year of potential net profit because of poor management by Mortimer. This estimate was substantially correct. Prior to October 1, 1958, it was clear that the earnings of the corporation were below standard, expenses were too high and out of control, that there was a need for considerable improvement in management controls, that it was imperative that immediate action be taken to bring earnings up to the earnings potential of the business, and that, if possible, all of this should be accomplished by the resignation of Mortimer from the corporation. Ultimate Findings As a result of the death of Nels Peterson in 1952, Mortimer achieved full managerial control of Peterson Manufacturing Company. Excepting Mortimer and Robert Peterson, all of the directors were lawyers. Robert is a well-trained, competent, business
1955 4,405,472 165,580 84,983
1961 Increase $488,620 $234,546 The corporation's net earnings steadily *403 decreased from 1954 earnings of $324,250, before taxes, to a net operating loss in 1958 (before adjustment for the net embezzlement recovery) of $39,878. Logan & Associates estimated that the corporation was losing about $250,000 a year of potential net profit because of poor management by Mortimer. This estimate was substantially correct. Prior to October 1, 1958, it was clear that the earnings of the corporation were below standard, expenses were too high and out of control, that there was a need for considerable improvement in management controls, that it was imperative that immediate action be taken to bring earnings up to the earnings potential of the business, and that, if possible, all of this should be accomplished by the resignation of Mortimer from the corporation. Ultimate Findings As a result of the death of Nels Peterson in 1952, Mortimer achieved full managerial control of Peterson Manufacturing Company. Excepting Mortimer and Robert Peterson, all of the directors were lawyers. Robert is a well-trained, competent, business
1955 4,405,472 165,580 84,983
1961 Increase $488,620 $234,546 The corporation's net earnings steadily decreased from 1954 earnings of $324,250, *404 before taxes, to a net operating loss in 1958 (before adjustment for the net embezzlement recovery) of $39,878. Logan & Associates estimated that the corporation was losing about $250,000 a year of potential net profit because of poor management by Mortimer. This estimate was substantially correct. Prior to October 1, 1958, it was clear that the earnings of the corporation were below standard, expenses were too high and out of control, that there was a need for considerable improvement in management controls, that it was imperative that immediate action be taken to bring earnings up to the earnings potential of the business, and that, if possible, all of this should be accomplished by the resignation of Mortimer from the corporation. Ultimate Findings As a result of the death of Nels Peterson in 1952, Mortimer achieved full managerial control of Peterson Manufacturing Company. Excepting Mortimer and Robert Peterson, all of the directors were lawyers. Robert is a well-trained, competent, business executive and all of his business experience has been obtained in the tallow rendering business. There developed over the years a deep and serious conflict between Mortimer and Robert *405 about the management of the corporation. Mortimer's attitude toward Robert involved resentment. Mortimer's holding of stock, 37 1/2 percent, did not give him voting control, but because he was a trustee of the Peterson Trust (whose trustees had to vote unanimously if they were to act without court direction) Mortimer was in a position to harass the other stockholders. The conflict and dissension between Mortimer and Robert had an adverse effect on the business of the corporation. The steady decline in earnings was due to Mortimer's ill-advised policies and lack of sound business judgment. Under all of the facts and circumstances, there was an actual, serious, and bona fide business need and purpose which compelled the elimination of Mortimer from his position of general manager, and since this could not be accomplished without purchasing all of his shares, the purchase thereof was based upon a real and necessary business purpose of the corporation. The problems of the corporation reached a climax in 1958. executive and all of his business experience has been obtained in the tallow rendering business. There developed over the years a deep and serious conflict between Mortimer and *406 Robert about the management of the corporation. Mortimer's attitude toward Robert involved resentment. Mortimer's holding of stock, 37 1/2 percent, did not give him voting control, but because he was a trustee of the Peterson Trust (whose trustees had to vote unanimously if they were to act without court direction) Mortimer was in a position to harass the other stockholders. The conflict and dissension between Mortimer and Robert had an adverse effect on the business of the corporation. The steady decline in earnings was due to Mortimer's ill-advised policies and lack of sound business judgment. Under all of the facts and circumstances, there was an actual, serious, and bona fide business need and purpose which compelled the elimination of Mortimer from his position of general manager, and since this could not be accomplished without purchasing all of his shares, the purchase thereof was based upon a real and necessary business purpose of the corporation. The problems of the corporation reached a climax in 1958. Mortimer's sudden offer to sell all of his shares required immediate action by petitioner, to whom the offer was made. However, petitioner acted for principals, a syndicate *407 of purchasers, including the corporation, the trust, members of the family, and himself, when he executed the option agreement on October 1, prepared by Mortimer, and when he made the arrangements for the immediate financing required, the temporary loan of $562,500. Petitioner, as the president, acted for the corporation in entering into the agreement and in arranging for the above temporary financing and for a long-term loan to the corporation so as to enable it to redeem 128 shares of Mortime's stock. Petitioner was not obligated to advise Mortimer on October 1 or thereafter, who the actual purchasers of the 375 shares were. The primary purpose of petitioner on October 1 and immediately thereafter was to take a necessary step towards solving the problems of the corporation. There was not involved any tax saving artifice, purpose, or motive. The price of $1,500 per share for Mortimer's shares was a fair price arrived at in arm's-length negotiations. The purchasers of Mortimer's shares under the agreement of Mortimer's sudden offer to sell all of his shares required immediate action by petitioner, to whom the offer was made. However, petitioner acted for principals, a syndicate *408 of purchasers, including the corporation, the trust, members of the family, and himself, when he executed the option agreement on October 1, prepared by Mortimer, and when he made the arrangements for the immediate financing required, the temporary loan of $562,500. Petitioner, as the president, acted for the corporation in entering into the agreement and in arranging for the above temporary financing and for a long-term loan to the corporation so as to enable it to redeem 128 shares of Mortime's stock. Petitioner was not obligated to advise Mortimer on October 1 or thereafter, who the actual purchasers of the 375 shares were. The primary purpose of petitioner on October 1 and immediately thereafter was to take a necessary step towards solving the problems of the corporation. There was not involved any tax saving artifice, purpose, or motive. The price of $1,500 per share for Mortimer's shares was a fair price arrived at in arm's-length negotiations. The purchasers of Mortimer's shares under the agreement of October 1, 1958, were Nels Hamberg, 51 shares; Anna Hamberg, 10 shares; Myrtle Peterson, 15 shares; Patricia Janney, 10 shares; Robert Peterson, 121 shares; the Peterson *409 Estate Trust, 40 shares; and Peterson Manufacturing Company, 128 shares. Petitioner acted as a conduit for these purchasers when he executed on October 1 the option given by Mortimer. He did not intend on October 1 to purchase 375 shares from Mortimer, or to purchase any more than 121 shares from Mortimer. He executed the option agreement as a temporary expedient. The above-named purchasers in fact purchased the shares stated from Mortimer. Prior to October 14, 1958, it was understood by American Trust Company and all of the purchasers of Mortimer's shares that the loan of $562,500 was a temporary expedient to enable the taking up of the option given by Mortimer; that the members of the syndicate of purchasers were to make repayment of the above sum to the bank; and that American Trust would hold Mortimer's certificate for 375 shares endorsed in blank in escrow until the members of the syndicate paid or arranged to make payments to American Trust in discharge of the above temporary loan. Although petitioner and his wife signed the note for the temporary loan of $562,500, which was done as a temporary expedient, that amount was in fact not a personal loan to petitioner; it was a loan *410 under an agreement for the benefit of the syndicate of purchasers, under which loan agreement American Trust agreed with petitioner that his personal liability was not in excess of between $100,000 and $125,000, secured by the listed marketable securities pledged by petitioner and his wife, having a market value of about $163,000. Peterson Manufacturing Company was obligated to purchase and did purchase from Mortimer 128 shares of its capital stock for a consideration of $192,000. In substance, the corporation paid $192,000 to Mortimer. The corporation's redemption of the 128 shares was compelled and justified by sound, corporate, business considerations and needs. In making the payment of $192,000 for 128 shares of its stock, the corporation did not relieve petitioner of any "pre-existing indebtedness." Petitioner did not realize any economic benefit as a result of the corporation's redemption of 128 shares of its capital stock in 1958. Petitioner did not receive a dividend during 1928, constructive or otherwise, in the amount of $192,000, or any portion thereof, as a result of the redemption of 128 shares of its stock by Peterson Manufacturing Company. The corporation acquired *411 and redeemed 128 shares of its stock in 1958 from its shareholder Mortimer in exchange for property consisting of $192,000 in money. This acquisition and redemption was not essentially equivalent to a dividend to Robert. There is no income tax deficiency for 1958 due from petitioners. Opinion The question is whether Robert Peterson received taxable income during 1958 in the amount of $192,000. Respondent determined that the acquisition by Peterson Manufacturing Company of 128 shares of its capital stock was done in such manner as to be equivalent to a dividend taxable to Robert under section 316 of the 1954 Code in the above amount; and that the provisions of sections 302(a) and (b)(1), dealing with redemptions of stock by a corporation which are not equivalent to dividends, do not apply. There are several seemingly conflicting decisions, involving the use of corporate funds to "buy out" a stockholder, about whether such "buy out" results in a constructive dividend to the continuing stockholders. There is a thin line between the cases cited by the parties. Petitioner relies on *412 Fox v. Harrison, 145 F. 2d 521 (C.A. 7, 1944); John A. Decker, 32 T.C. 326 (1959) affd. per curiam 286 F. 2d 427 (C.A. 6, 1960); Niederkrome v. Commissioner, 266 F. 2d 238 (C.A. 9, 1958), certiorari denied 359 U.S. 945; Holsey v. Commissioner, 258 F. 2d 865 (C.A. 3, 1958), reversing 28 T.C. 962; Milton F. Priester, 38 T.C. 316 (1962), and Rollin C. Reynolds, 44 B.T.A. 342 (1941). Respondent argues that this case is controlled by Wall v. United States, 164 F. 2d 462 (C.A. 4, 1947); Monroe Zipp, 28 T.C. 314 (1957), affd. 259 F. 2d 119 (C.A. 6, 1958); Schalk Chemical Co., 32 T.C. 879 (1959), affd. 304 F. 2d 48 (C.A. 9, 1962); Lowenthal v. Commissioner, 169 F. 2d 694 (C.A. 7, 1948); Woodworth v. Commissioner, 218 F. 2d There are several seemingly conflicting decisions, involving the use of corporate funds to "buy out" a stockholder, about whether such "buy out" results in a constructive dividend to the continuing stockholders. There is a thin line between the cases cited by the parties. Petitioner *413 relies on Fox v. Harrison, 145 F. 2d 521 (C.A. 7, 1944); John A. Decker, 32 T.C. 326 (1959) affd. per curiam 286 F. 2d 427 (C.A. 6, 1960); Niederkrome v. Commissioner, 266 F. 2d 238 (C.A. 9, 1958), certiorari denied 359 U.S. 945; Holsey v. Commissioner, 258 F. 2d 865 (C.A. 3, 1958), reversing 28 T.C. 962; Milton F. Priester, 38 T.C. 316 (1962), and Rollin C. Reynolds, 44 B.T.A. 342 (1941). Respondent argues that this case is controlled by Wall v. United States, 164 F. 2d 462 (C.A. 4, 1947); Monroe Zipp, 28 T.C. 314 (1957), affd. 259 F. 2d 119 (C.A. 6, 1958); Schalk Chemical Co., 32 T.C. 879 (1959), affd. 304 F. 2d 48 (C.A. 9, 1962); Lowenthal v. Commissioner, 169 F. 2d 694 (C.A. 7, 1948); Woodworth v. Commissioner, 218 F. 2d 719 (C.A. 6, 1955), and Holloway v. Commissioner, 203 F. 2d 566 (C.A. 6, 1953) affirming a Memorandum Opinion (1951) of this Court. The main issue is whether the corporation's acquisition of the 128 shares constituted a redemption of the shares *414 within the provisions of section 317(b), [1] and whether the redemption was not essentially equivalent to a dividend under section 302(b)(1). [2]
*415 *416 Petitioner contends that the corporation acquired the 128 shares from Mortimer in exchange for property - money - and therefore redeemed these shares *417 within the provisions of section 317(b), and that the redemption comes within section 302(b)(1) because it was not equivalent to a dividend. Petitioner contends that the substance and not the form of the transaction with Mortimer is controlling; that is to say, that the corporation did not acquire the 128 shares from Robert Peterson; that the corporation did not pay $192,000 to relieve Robert of a "pre-existing debt" in that amount; and that Robert did not receive a dividend of $192,000 from the corporation, constructive or otherwise, under any theory. Respondent disputes all of petitioner's contentions; he claims that the corporation acquired the shares from Robert and paid $192,000 to relieve him of a "pre-existing debt" in that amount. Respondent's view is that the corporation's acquisition of the 128 shares represents a capital contribution to the corporation of $192,000 by Robert which served to increase the basis of his shares. He included $192,000 in petitioner's income. He does not concede that the corporation redeemed the shares. Although his position under this aspect of the issue is not wholly clear, it appears that it is taken so as to be consistent with respondent's *418 whole view. Respondent is arguing form over substance. His insistence that the form of the transaction should control presents several fact questions which arise out of the opposing and contradictory views of the parties about the real facts. The conflict about the facts results from respondent's rejection of petitioner's contention that at all times, on October 1, 1958, and thereafter, Robert acted as a conduit for a group of purchasers of Mortimer's 375 shares, which included the corporation for which he acted in his capacity of president; and that at no time did he obligate himself to purchase 375 shares from Mortimer or obligate himself for a personal indebtedness of $562,500 for purchasing all of the shares for his own account. In view of the sharply divergent contentions of the parties, detailed findings are required and have been made. The findings are dispositive of all of the fact questions, but in view of respondent's challenging of practically every contention of petitioner about the facts and circumstances we deem it necessary to comment upon the following as preliminary matters: We are unable to find a reasonable basis in fact for respondent's unwillingness to concede *419 that Mortimer's management of the corporation's operations and business was unsatisfactory and incompetent. The proof is substantial that the corporation was failing to earn about $250,000 a year of realizable earnings and that this failure was directly due to Mortimer's extravagant policies, costly internal arrangements, lack of efficient managerial methods, and poor business judgment about marketing procedures and relations with customers, all of which resulted in a wholly inadequate effort to maintain a normal and reasonable level of earnings. Under his management, earnings were substandard and petitioner was justified in concluding that if remedies were not adopted the corporation would continue to operate at a loss, suffer substantial losses of sales, and sustain further impairment of its business. Petitioner was and is the president of the corporation, as well as a stockholder, and it was his duty to be concerned about the trend of earnings and losses and whether or not the general manager was pursuing disastrous policies. There was a serious conflict between Mortimer and petitioner about corporation policies. The record does not support respondent's suspicions nor his view *420 that petitioner had some personal, ulterior, and undisclosed motives. Respondent's approach has been to attempt to provide a basis for arguing that there was no corporate business purpose to be served in the corporation's acquiring and redeeming some of its stock. With that view we do not agree. The uncontradicted evidence, confirmed by Mortimer's testimony, is that Mortimer would not give up the position of general manager, leave the company, and resign from the offices of vice-president and director until he received payment in full for his shares of $562,500. Moreover, after receiving the Logan report, Mortimer was angry and uncooperative and the circumstances were such that it was not prudent or feasible for Robert to take the time to get Mortimer's draft of the option agreement rewritten to set forth and reveal to Mortimer the details of how the buy-out of the 375 shares would be effected. The findings and conclusion are that whether or not the general manager was pursuing disastrous policies. There was a serious conflict between Mortimer and petitioner about corporation policies. The record does not support respondent's suspicions nor his view that petitioner had some personal, *421 ulterior, and undisclosed motives. Respondent's approach has been to attempt to provide a basis for arguing that there was no corporate business purpose to be served in the corporation's acquiring and redeeming some of its stock. With that view we do not agree. The uncontradicted evidence, confirmed by Mortimer's testimony, is that Mortimer would not give up the position of general manager, leave the company, and resign from the offices of vice-president and director until he received payment in full for his shares of $562,500. Moreover, after receiving the Logan report, Mortimer was angry and uncooperative and the circumstances were such that it was not prudent or feasible for Robert to take the time to get Mortimer's draft of the option agreement rewritten to set forth and reveal to Mortimer the details of how the buy-out of the 375 shares would be effected. The findings and conclusion are that whether or not the general manager was pursuing disastrous policies. There was a serious conflict between Mortimer and petitioner about corporation policies. The record does not support respondent's suspicions nor his view that petitioner had some personal, ulterior, and undisclosed motives. *422 Respondent's approach has been to attempt to provide a basis for arguing that there was no corporate business purpose to be served in the corporation's acquiring and redeeming some of its stock. With that view we do not agree. The uncontradicted evidence, confirmed by Mortimer's testimony, is that Mortimer would not give up the position of general manager, leave the company, and resign from the offices of vice-president and director until he received payment in full for his shares of $562,500. Moreover, after receiving the Logan report, Mortimer was angry and uncooperative and the circumstances were such that it was not prudent or feasible for Robert to take the time to get Mortimer's draft of the option agreement rewritten to set forth and reveal to Mortimer the details of how the buy-out of the 375 shares would be effected. The findings and conclusion are that the corporation acquired from Mortimer and redeemed the 128 shares, and did so for compelling business reasons and corporate purposes. The record does not disclose that there were any tax saving or avoidance motives or purposes in the way the transaction to purchase the 375 shares was done, and we are unable to agree with *423 respondent's suggestions to that effect. Respondent is incorrect in arguing that Mortimer, as a stockholder, was in control of the corporation. The evidence does not establish that under California law Mortimer as one of three trustees of the Peterson trust owning 375 shares could have blocked the voting of all of the trust's shares by refusing to vote and thereby achieve the status of majority stock for his 375 shares. Section 2223 of the California Corporations Code applies to the voting of shares in a corporation where there are two or more trustees, and it provides that "Shares standing in the names of two or more persons shall be voted * * * in accordance with the vote or consent of the majority of the persons in whose names the shares stand." The shares owned by the trust were evidenced by a certificate issued in the name of the trust, with the names of the then three trustees included. The most Mortimer, the corporation acquired from Mortimer and redeemed the 128 shares, and did so for compelling business reasons and corporate purposes. The record does not disclose that there were any tax saving or avoidance motives or purposes in the way the transaction to purchase the *424 375 shares was done, and we are unable to agree with respondent's suggestions to that effect. Respondent is incorrect in arguing that Mortimer, as a stockholder, was in control of the corporation. The evidence does not establish that under California law Mortimer as one of three trustees of the Peterson trust owning 375 shares could have blocked the voting of all of the trust's shares by refusing to vote and thereby achieve the status of majority stock for his 375 shares. Section 2223 of the California Corporations Code applies to the voting of shares in a corporation where there are two or more trustees, and it provides that "Shares standing in the names of two or more persons shall be voted * * * in accordance with the vote or consent of the majority of the persons in whose names the shares stand." The shares owned by the trust were evidenced by a certificate issued in the name of the trust, with the names of the then three trustees included. The most Mortimer, the corporation acquired from Mortimer and redeemed the 128 shares, and did so for compelling business reasons and corporate purposes. The record does not disclose that there were any tax saving or avoidance motives or *425 purposes in the way the transaction to purchase the 375 shares was done, and we are unable to agree with respondent's suggestions to that effect. Respondent is incorrect in arguing that Mortimer, as a stockholder, was in control of the corporation. The evidence does not establish that under California law Mortimer as one of three trustees of the Peterson trust owning 375 shares could have blocked the voting of all of the trust's shares by refusing to vote and thereby achieve the status of majority stock for his 375 shares. Section 2223 of the California Corporations Code applies to the voting of shares in a corporation where there are two or more trustees, and it provides that "Shares standing in the names of two or more persons shall be voted * * * in accordance with the vote or consent of the majority of the persons in whose names the shares stand." The shares owned by the trust were evidenced by a certificate issued in the name of the trust, with the names of the then three trustees included. The most Mortimer, the corporation acquired from Mortimer and redeemed the 128 shares, and did so for compelling business reasons and corporate purposes. The record does not disclose that *426 there were any tax saving or avoidance motives or purposes in the way the transaction to purchase the 375 shares was done, and we are unable to agree with respondent's suggestions to that effect. Respondent is incorrect in arguing that Mortimer, as a stockholder, was in control of the corporation. The evidence does not establish that under California law Mortimer as one of three trustees of the Peterson trust owning 375 shares could have blocked the voting of all of the trust's shares by refusing to vote and thereby achieve the status of majority stock for his 375 shares. Section 2223 of the California Corporations Code applies to the voting of shares in a corporation where there are two or more trustees, and it provides that "Shares standing in the names of two or more persons shall be voted * * * in accordance with the vote or consent of the majority of the persons in whose names the shares stand." The shares owned by the trust were evidenced by a certificate issued in the name of the trust, with the names of the then three trustees included. The most Mortimer, the corporation acquired from Mortimer and redeemed the 128 shares, and did so for compelling business reasons and corporate *427 purposes. The record does not disclose that there were any tax saving or avoidance motives or purposes in the way the transaction to purchase the 375 shares was done, and we are unable to agree with respondent's suggestions to that effect. Respondent is incorrect in arguing that Mortimer, as a stockholder, was in control of the corporation. The evidence does not establish that under California law Mortimer as one of three trustees of the Peterson trust owning 375 shares could have blocked the voting of all of the trust's shares by refusing to vote and thereby achieve the status of majority stock for his 375 shares. Section 2223 of the California Corporations Code applies to the voting of shares in a corporation where there are two or more trustees, and it provides that "Shares standing in the names of two or more persons shall be voted * * * in accordance with the vote or consent of the majority of the persons in whose names the shares stand." The shares owned by the trust were evidenced by a certificate issued in the name of the trust, with the names of the then three trustees included. The most Mortimer, as one of the trustees, could have done was to attempt willfully to cause *428 delays and interference by refusing to agree with the other trustees, but if he had done so (and there is no evidence that he did), the other trustees could have sought instructions and orders from the court having jurisdiction over the trust to prevent such obstruction. Respondent's argument that Mortimer exercised control of the corporation as a stockholder because he was one of the three trustees is rejected and a finding has been made to the contrary. Respondent's view that the buy-out of Mortimer did not include redemption of 128 shares within the provisions of section 317(b) apparently is due to his argument that the corporation paid $192,000 to relieve petitioner of a preexisting debt to that extent. We do not agree with that contention. There is no difficulty in concluding that the shares were redeemed. The corporation acquired them for their then fair market value arrived at under an arm's-length transaction, after which the 128 shares no longer represented a liability of the corporation and ceased to have any present vitality or significance. The corporation's acquisition of these shares was in exchange for property (cash) and as one of the trustees, could have done was *429 to attempt willfully to cause delays and interference by refusing to agree with the other trustees, but if he had done so (and there is no evidence that he did), the other trustees could have sought instructions and orders from the court having jurisdiction over the trust to prevent such obstruction. Respondent's argument that Mortimer exercised control of the corporation as a stockholder because he was one of the three trustees is rejected and a finding has been made to the contrary. Respondent's view that the buy-out of Mortimer did not include redemption of 128 shares within the provisions of section 317(b) apparently is due to his argument that the corporation paid $192,000 to relieve petitioner of a preexisting debt to that extent. We do not agree with that contention. There is no difficulty in concluding that the shares were redeemed. The corporation acquired them for their then fair market value arrived at under an arm's-length transaction, after which the 128 shares no longer represented a liability of the corporation and ceased to have any present vitality or significance. The corporation's acquisition of these shares was in exchange for property (cash) and comes within *430 section 317(b). Turning now to the chief question, it is recognized in the case law and the regulations that whether or not an acquisition and redemption of shares of stock is equivalent to the distribution of a dividend must be determined from all of the facts and circumstances in each case. The cases have established certain factual criteria or guideposts that should be considered, but, there is no rule of construction applicable alike in all cases or a combination of criteria that will give the conclusive answer in each case. Some factors are given more weight in some cases, while others are considered more important in other cases. See John A. Decker, supra, p. 331, and section 1.302-2(b), Income Tax Regulations.
Upon careful consideration of all of the testimony and documentary evidence, we are convinced and conclude as follows: That in reality Robert Peterson, on October 1, 1958, and thereafter, acted as a conduit for a syndicate of purchasers, the corporation, the Peterson Trust, his mother and sister, and Nels and Anna Hamberg who, we are satisfied, were the real purchasers of 254 of the 375 shares; that Robert did not ever purchase and did not ever intend *431 to purchase any more than the 121 shares for which a certificate was issued in his name on December 31, 1958; that the corporation and each individual member of the syndicate purchased the number of shares issued in its, his, and her name from Mortimer; that Robert obtained the temporary financing of $562,500 for the benefit of the syndicate of purchasers and that it was only a temporary expedient resorted to under all of the circumstances in order to take up the option given by Mortimer on October 1, 1958; and that Robert did not incur at any time in reality and in substance a personal indebtedness to American Trust Company in any amount in excess of $125,000. The corporation itself received 128 shares, a valuable asset, for which it paid $192,000. Prior to the corporation's payment of $192,000, the corporation adopted resolutions authorizing its president, Robert, and secretary, Nels Hamberg, to purchase 128 shares at the price of $1,500 per share, which shares were to be held as treasury stock; and the corporation confirmed, ratified, and approved all of the previous acts taken by its president "for and on behalf of this corporation for the purchase and acquisition ever intend to *432 purchase any more than the 121 shares for which a certificate was issued in his name on December 31, 1958; that the corporation and each individual member of the syndicate purchased the number of shares issued in its, his, and her name from Mortimer; that Robert obtained the temporary financing of $562,500 for the benefit of the syndicate of purchasers and that it was only a temporary expedient resorted to under all of the circumstances in order to take up the option given by Mortimer on October 1, 1958; and that Robert did not incur at any time in reality and in substance a personal indebtedness to American Trust Company in any amount in excess of $125,000. The corporation itself received 128 shares, a valuable asset, for which it paid $192,000. Prior to the corporation's payment of $192,000, the corporation adopted resolutions authorizing its president, Robert, and secretary, Nels Hamberg, to purchase 128 shares at the price of $1,500 per share, which shares were to be held as treasury stock; and the corporation confirmed, ratified, and approved all of the previous acts taken by its president "for and on behalf of this corporation for the purchase and acquisition of said shares of *433 this corporation from Richard B. Mortimer * * * as the acts of this corporation." The corporation paid and Mortimer received $1,500 for each share. Petitioner received nothing in respect of the 128 shares; his net worth was not increased; he did not receive any economic benefit from the corporation's acquisition of 128 shares; the 128 shares were never issued in his name, he never had any power to vote or receive dividends on those shares, and he never had control over them. Mortimer's certificate for 375 shares was endorsed in blank and it was held by American Trust Company as further security for the temporary financing in an informal escrow, until the real and actual purchases by the members of the syndicate were substantially concummated, at which time the bank surrendered to the corporation the certificate evidencing all of Mortimer's shares. A certificate evidencing 128 shares was thereafter reissued in the name of the corporation and ever since has been held as treasury shares. Lakewise, certificates were reissued to and in the respective names of the other purchasers, as is set forth in the findings, which evidenced the number of shares acquired by each purchaser. Petitioner *434 purchased only 121 shares. The evidence establishes without any contradiction or doubt that American Trust Company provided temporary financing of $562,500 with the original understanding that this sum would be "taken up" immedately by the individual purchasers, the trust, and the corporation, and that American Trust understood prior to approving the temporary financing that petitioner's personal indebtedness under the whole plan would be for no more than between $100,000 and $125,000 in order to purchase not more than one-third or about 125 shares of the Mortimer block of stock. The American Trust loan committee had before it from the start the whole plan for the purchase of the Mortimer stock by a group which included the corporation which embraced the details about the approximate amount of cash to be paid by each purchaser, a long-term loan to the corporation of about $200,000 for the purchase of about one-third of the stock from Mortimer, and another long-term loan of about $100,000 to Robert to enable him to purchase about one-third of the shares. In fact, the loan committee of the bank approved both the temporary and the long-term financing at the same time and in advance *435 of the bank's payment of $562,500 to the Bank of America for payment to Mortimer. Memoranda of Kendrick B. Morrish, vice-president, to his superior loan officers dated October 6 and 10, 1958, other records of the bank, and the testimony of Morrish clearly establish what the details were of the whole plan for carrying out the purchase of the 375 shares by a group, and that the corporation would purchase shares from Mortimer. The form of the arrangements were dictated by the exigencies of the situation and Mortimer's actions. Petitioner did not create the situation which could be dealt with only by the temporary financing. Mortimer required full payment for his shares at $1,500 per share, $562,500, within 30 days. American Trust regarded temporary financing, the payment of the above sum to the Bank of America, as a temporary expedient and as the only way Mortimer's option could be taken up. The bank did not regard the temporary financing as a personal loan of $562,500 to Robert. Morrish testified that the bank considered Robert's assets and earnings and concluded that they would not support a personal loan of $562,500 to Robert individually. American Trust also looked into the financial *436 condition and responsibility of Peterson Manufacturing Company before advancing the sum required for the temporary financing and concluded that in order to preserve the corporation's working capital it would be necessary to make a long-term loan to the corporation so that it could acquire and redeem about one-third of Mortimer's shares; the bank required security for such long-term loan consisting of a continuing guarantee by Peterson Tallow Company. The evidence clearly establishes that the portion of the $562,500 temporary financing which was attributable to the $192,000 later paid by Peterson Manufacturing Company was not in substance and in a true sense a "personal obligation" of Robert. Upon the entire record, the finding and conclusion is that the loan of $562,500 did not represent a "pre-existing indebtedness" of Robert. The entire obligation to pay $562,500 was incurred for the sole purpose of and contemporaneously with effectuating the taking up of the option and the buying out of Mortimer. The evidence establishes that the loan was only a temporary expedient approved by American Trust with the prior understanding that the substantive and real financing, which followed immediately *437 and as soon as possible, consisted of the cash payments by each of the individual purchasers out of their own funds in the aggregate sum of $245,500, together with a long-term loan of $192,000 to the corporation with which to redeem 128 shares, and a long-term loan to petitioner of $125,000 to finance his purchase of 121 shares for which he paid cash of $56,500. Prior to the temporary advance of $562,500, the loan committee of American Trust ascertained and agreed that the assets of Robert and his wife, listed securities of a then market value of $163,000, would support a personal loan to them of only from $100,000 to $125,000, and no more; the loan of $125,000 is the only long-term loan the bank ever made to Robert. Correspondingly, we reject as unsupported by the whole record respondent's contention that Peterson Manufacturing Company's payment of $192,000 represented payment of a pre-existing personal indebtedness of Robert in that amount to American Trust. In addition, it is concluded that petitioner discharged his burden of proof. Petitioner's testimony is supported by the testimony of other witnesses, particularly that of Morrish, and by documentary evidence, especially the bank *438 records and memoranda. This Court finds and concludes that Robert's testimony is wholly credible. Respondent's determination is based solely upon the temporary financing and assistance provided by American Trust. He treated as determinative the form of financing which was resorted to because of the exigencies of the situation and wholly disregarded what clearly was the real and substantive financing - the long-term loans. He erred in so doing. "In the field of taxation, administrators of the law and the courts are concerned with substance and realities." Helvering v. F. & R. Lazarus & Co., 308 U.S. 252. The taxpayer as well as the Government is entitled to the benefit of the rule that the substance rather than the form of a transaction controls. Landa v. Commissioner, 206 F. 2d 431, 432. There was in substance just one transaction, the buy-out of Mortimer, under one plan adopted before the temporary financing on October 14. There were not two transactions, as respondent in effect contends. Robert did not act solely for himself in the single transaction and in making the arrangements for the temporary and long-term financing. He acted on behalf of the *439 corporation throughout with respect to the 128 shares which the corporation acquired. The corporation acquired them from Mortimer. In several respects the instant case resembles Fox v. Harrison, supra, but the facts there were less favorable to the taxpayer than those here because Fox obtained control over the shares of stock involved and actually incurred liability for the purchase price. In this case, Robert did not obtain control over the 128 shares in question. They were held by American Trust under what was tantamount to an escrow, as Morrish testified, until all the details were completed for payment of the full purchase price to American Trust under the long-term loan to Peterson Manufacturing Company, $192,000 of which was used by the corporation to pay the full purchase price for 128 shares. Robert did not in substance and reality incur any personal liability for the purchase of and he did not in fact purchase the 128 shares. This case also has certain aspects which resemble those in John A. Decker, supra.Here, as in the Decker case, it is evident that the plan was that the corporation would acquire some of its shares from the retiring shareholder, *440 and the cash paid out by the corporation in fact did not go to the petitioner, whom respondent seeks to charge with a dividend, but went into the hands of the retiring shareholder, Mortimer. Here, as in Decker, the petitioner did not realize any real and true economic benefit from the corporation's acquisition and redemption of 128 shares. The instant case comes within the reasoning, also, of Milton F. Priester, supra; Holsey v. Commissioner, supra, and Niederkrome v. Commissioner, supra.In Priester, this Court adopted the principles enunciated by the Court of Appeals in Niederkrome, and, consequently, we follow them here. See, also Benjamin H. Freeman, 41 T.C. - (1963). When a corporation obligates itself to purchase shares of its own stock, which it is found was done here, the courts have held that there is not a constructive dividend to another stockholder or other stockholders. See S. K. Ames, Inc., 46 B.T.A. 1020 (1942); and Niederkrome v. Commissioner, supra. The cases on which respondent relies have been fully considered. No purpose will be served by stating the facts and factors which serve to distinguish *441 each of them from this proceeding, but it is noted that on their particular facts Wall v. United States, supra, Louis H. Zipp, supra, and Schalk Chemical Co., supra, are distinguishable. None of the cases cited by respondent control the issue in this case. It is held that the payment by Peterson Manufacturing Company of $192,000 was not equivalent to a dividend taxable to petitioner, and that under no theory is petitioner chargeable with the receipt of income of $192,000. Decision will be entered for the petitioners. Footnotes
*. Actual net loss from operations in 1958 before taking into account the recovery in 1958 under the award of the Nevada District Court in the suit against Frederick F. Robertson to recover funds embezzled in prior years. The net sum recovered was $63,025 after costs. The recovery of this net amount resulted in adjustment of the net operating loss in 1958 to net profit before taxes of $23,147, and to net profit after taxes of $16,175. Federal income taxes for 1958 were $6,972 due to the recovery.↩
1. SEC. 317. OTHER DEFINITIONS. (a) Property. - For purposes of this part, the term "property" means money, securities, and any other property; except that such term does not include stock in the corporation making the distribution (or rights to acquire such stock). (b) Redemption of Stock. - For purposes of this part, stock shall be treated as redeemed by a corporation if the corporation acquires its stock from a shareholder in exchange for property, whether or not the stock so acquired is cancelled, retired, or held as treasury stock. ↩
2. SEC. 302. DISTRIBUTIONS IN REDEMPTION OF STOCK. (a) General Rule. - If a corporation redeems its stock (within the meaning of section 317(b), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be 719 (C.A. 6, 1955), and Holloway v. Commissioner, 203 F. 2d 566↩ (C.A. 6, 1953) affirming a Memorandum Opinion (1951) of this Court.